COMMONWEALTH *vs.* ROBERT L. HUBBARD.

Suffolk.   December 5, 1975. — October 6, 1976.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, & WILKINS, JJ.

*Practice, Criminal,* New trial, Plea, Defendant's competency.  *Evidence,* Offer of proof, Hospital record.

There was no error in the denial of a defendant's motion to withdraw his plea of guilty to so much of an indictment as charged murder in the second degree where the only evidence as to the defendant's contention that he was suffering from amnesia and had no recollection of the crime charged against him was the defendant's oral testimony at the hearing which was apparently disbelieved by the judge [168-169]; even if the defendant's assertion that he had amnesia at the time of his plea had been established by the evidence, a conclusion that he was therefore incompetent to stand trial or plead guilty would not be required  [169-172].

There was no error in the failure of a judge sua sponte to hold a hearing on the defendant's competence to stand trial or plead guilty where there was no substantial question of possible doubt with re-
. gard to the defendant's competence.  [172-173]

At a hearing on a defendant's motion to withdraw a guilty plea on the ground that the defendant was incompetent to stand trial or plead guilty, the defendant's contention that as a result of his incompetence a defense might have been lost was too speculative to warrant consideration.  [173]

On appeal from the denial of a defendant's motion to withdraw a guilty plea, no error was shown in the judge's exclusion of certain questions where the defendant either failed to make any offer of proof or made an unresponsive offer.  [174]

At a hearing on a defendant's motion to withdraw his guilty plea, there was no error in the refusal of the trial judge to admit in evidence

an affidavit of a police officer, who appeared to have some training and expertise in the field of alcoholism, as to his observations concerning the defendant's behavior prior to and subsequent to the crime. [174-175]

At a hearing on a defendant's motion to withdraw his guilty plea, there was no error in the exclusion of unauthenticated and uncertified copies of hospital records. [175-176]

INDICTMENT found and returned in the Superior Court on April 18, 1969.

A motion to vacate sentence and withdraw a plea of guilty was heard by *Ronan, J.*

*David A. Sonenshein* for the defendant.

*Thomas F. Reilly,* Special Assistant District Attorney (*Kathleen M. Curry,* Assistant District Attorney, with him) for the Commonwealth.

QUIRICO, J.   The defendant was indicted for murder in the first degree of one George R. Alexander. On June 18, 1969, he pleaded guilty to so much of the indictment as charged the crime of murder in the second degree and was sentenced to life imprisonment therefor. On October 8, 1974, he filed a motion to vacate the sentence and plea,[1] which motion, after a hearing thereon, was denied on March 27, 1975. The case is before us on the defendant's appeal under G. L. c. 278, §§ 33A-33G, assigning as alleged errors the denial of the motion and the exclusion of certain evidence at the hearing thereon. We hold that there was no error.

A brief statement of background information may be helpful. On April 15, 1969, the defendant was driving his car on a street in Boston with Robert Ranahan as his passenger. As will be described later in this opinion, both had been drinking heavily over a prolonged period of time. When the car in front of the defendant's stopped in traffic, the front end of his car "tapped" the rear end of the other car. The two drivers got out and had a conversation while

---

[1] This was the relief requested by the motion which was entitled "Motion for New Trial." There had been no completed trial because the trial which was started was terminated by the act of the defendant in pleading guilty.

standing between the two cars. The defendant returned to his car, took something from it, presumably a knife, and returned to the other man who was Alexander. He was seen to swing at Alexander who dropped to the road and was later found to have suffered cuts and stab wounds from which he died. The defendant returned to his car, told Ranahan, "I killed him," and drove away with Ranahan as his passenger, without making himself known. Someone at the scene took the defendant's car registration number and gave it to the police who arrested the defendant and Ranahan the next morning, April 16, 1969.

The grand jury returned an indictment against the defendant on April 18, 1969, charging him with the murder in the first degree of Alexander. On April 23, 1969, a judge of the Superior Court appointed Mr. William H. Coogan, a lawyer of considerable experience in the trial of criminal cases, as counsel for the defendant. Mr. Coogan filed numerous pre-trial motions for discovery and for authorization to expend public funds to employ experts and to enable him to prepare for the defense of the case, he hired an investigator to assist in the preparation of the case, and he conferred at length and on numerous occasions with the defendant.

On April 23, 1969, the defendant was committed to the Bridgewater State Hospital for observation for a period not to exceed thirty-five days. On May 21, 1969, the acting medical director of the hospital sent a report to the court reviewing the defendant's history and examination and concluding as follows: "He has been in good contact with reality during his observation and shows no signs of overt psychosis. He knows the nature of his charges and the possible consequences if convicted, and appears competent to assist his attorney in his own defense. Therefore, his return to court as competent to stand trial is recommended. Diagnosis: Sociopathic Personality, Antisocial Type, with Chronic Alcoholism and Drug Addiction."

Trial of the case started on June 16, 1969. In the Commonwealth's case, the prosecutor first introduced the death certificate in which the medical examiner certified that the

cause and manner of Alexander's death was: "Stab wound of the neck and abdomen, homicide." He next introduced four large photographs, twelve by twenty-four inches in size, taken by a police photographer and showing the victim's body and the wounds thereon. The medical examiner then described the autopsy performed by him and the wounds which he found on the victim's body, including one which he said was a "cut [which] goes into the heart, cutting clear through the heart, just about through the heart into the muscle wall over on this side." He used one of the photographs of the victim's body to illustrate his testimony. The next, and last, witness was Ranahan. He testified that he was with the defendant most of the time from Saturday, April 12, 1969, until Tuesday, April 15, 1969, including the time of the incident which resulted in the death of Alexander, and continuing until the next morning when both were arrested. He described their movements on those days, and in particular their seemingly continuous drinking of beer, wine, and other alcoholic beverages up to, and then again after, the fatal encounter. On the afternoon of April 15, 1969, they decided to go fishing in Boston harbor, and on the way they stopped at a bait shop where the defendant purchased some bait and a fish knife. After doing some fishing, during which time they drank some wine, they drove away, with the defendant driving, and at Neponset Circle in Dorchester they became involved in the slight accident already described above. Ranahan described in detail the defendant's action and conduct at the scene of that accident. After leaving the scene of the accident the defendant was bleeding from the thumb, so they stopped at a drug store where Ranahan purchased some band-aids which he used to stop the bleeding. They went to an apartment in Jamaica Plain where other persons were present. There was discussion about a knife and what the defendant had done. When someone asked him what he had done, he said, "I shanked him." During this conversation Ranahan saw a knife which he identified when it was shown to him at the trial. He also identified it as "a fair representation of

the knife" bought at the bait shop. The defendant and Ranahan were then informed of a police radio broadcast stating that they were wanted by the police for homicide. They both left the apartment, went to several places in an unsuccessful effort to borrow money with which to leave the area, then returned to the apartment where they were arrested later.

At the conclusion of Ranahan's testimony the trial judge was informed that the defendant desired to plead guilty to so much of the indictment as charged him with murder in the second degree. This was followed by the defendant's being sworn and then questioned in part by the judge and in part by the defendant's counsel. The thrust of the questioning was to determine whether the defendant understood the nature and elements of the crimes of murder in the first degree and murder in the second degree and the penalty for each, whether he had committed the crime, whether his offer to plead guilty was influenced by any promises or threats made to him, and generally whether his offer to plead was his voluntary act. The judge gave him an opportunity to present any facts he wished on the issue being considered. On questioning by his counsel the defendant testified about his prolonged and heavy drinking of alcoholic beverages prior to April 15, 1969, and about his use of drugs, specifically LSD, about April 10 and 11, 1969.

The answers by the defendant to questions by the judge and counsel indicated that he knew that on April 15, 1969, he had purchased a fishing knife and had killed Alexander, that he knew the nature and elements of the crimes of murder in the first degree and murder in the second degree, and the penalties therefor, that he was offering to plead guilty "willingly and freely and voluntarily" after having consulted with his counsel, and that no one had made any promises or threats to him to induce him to plead. The judge then accepted the plea of guilty of murder in the second degree, informed the jury of that fact, and ordered that the defendant be imprisoned for life. G. L. c. 265, § 2. In his statement dismissing the jury the judge

stressed the fact that because of the defendant's prolonged and heavy drinking up to the time he committed the crime it was unlikely that they would have found him capable of the premeditation required to convict for murder in the first degree. All proceedings on the plea of guilty and the sentencing of the defendant occurred on June 18, 1969.

The next development in this case occurred on April 14, 1970, when the defendant filed a motion to retract his plea of guilty, and that motion was itself amended by a motion allowed on December 10, 1971. The motion and its amended version were the subject of a number of hearings, dealing principally with the assignment or withdrawal of counsel for the defendant, extending to January 19, 1972, without any action having been taken on the merits of the motion to retract the plea.

There was no further action in the case until October 8, 1974, when the defendant filed the motion to vacate his sentence and plea which is involved in the present appeal. By his motion the defendant sought relief on two principal grounds, both dependent on a claim that he was suffering from a "blackout" at the time of the alleged crime and that from the time of his arrest and continuing at the time of argument before this court, he "has had absolutely no memory of the crime charged." On that basis the defendant contends in his motion, and now before this court, that (a) he was not competent to stand trial or to plead guilty, and (b) he lost an opportunity to advance a defense that at the time of the crime he lacked the "mental capacity to commit the crime charged" because he was under the influence of the drug LSD which had been administered to him involuntarily, and that he was not aware of it at the time he entered his plea of guilty.

At the evidentiary hearing held on the motion on March 14, 1975, before a judge other than the trial judge,[2] the defendant was represented by a lawyer from the Massachusetts Defenders Committee who had filed the motion

---

[2] The trial judge had retired before this motion was filed, and therefore the motion was heard and denied by a different judge of the Superior Court.

for him. Through his new counsel the defendant presented testimony from six witnesses including the defendant, his original trial counsel (Mr. Coogan), and Ranahan. The judge ordered that the hearing be held subject to G. L. c. 278, §§ 33A-33G, and a transcript of the proceedings is available to us. On March 27, 1975, the judge filed a written decision stating his subsidiary findings of fact, his rulings of law, and his ultimate conclusion based thereon that the defendant's "offer to plead was voluntary, and a knowing and intelligent waiver of his right to trial." The motion was therefore "dismissed."

We summarize the subsidiary facts found by the judge who heard the motion, without repeating any facts already stated above in this opinion. At his first meeting with Mr. Coogan and at all times since then the defendant has stated and maintained that he has no memory of his whereabouts or activities at or about the time Alexander was killed on April 15, 1969. The defendant told Mr. Coogan that before the killing he had been drinking with Ranahan, Charles Kronis, Richard L. Beede, and certain others for a period of several days. Prior to trial, Mr. Coogan told the defendant he had learned that Ranahan was to testify against him, but Mr. Coogan did not know what the testimony would be, that he had seen photographs of the victim's wounds and that they were particularly gruesome. He told the defendant that a jury could return one of four possible verdicts: not guilty, guilty of manslaughter, guilty of murder in the second degree, or guilty of murder in the first degree, and he explained the elements of each of those three crimes. He stated the maximum penalty for each of the three crimes with the possibility that for murder in the first degree it would be a sentence of death absent a recommendation by the jury that it be not imposed, and that in the event of a life sentence for murder in the second degree there was a possibility of parole after fifteen years but none from a life sentence for murder in the first degree.[3]

---

[3] The information thus given by Mr. Coogan to the defendant on the possibility of a penalty of death for murder in the first degree was

Commonwealth *v.* Hubbard.

With the defendant's prior consent and approval, Mr. Coogan made a pre-trial effort to have the judge who was to preside at the trial accept a plea of guilty to so much of the indictment as charged the crime of manslaughter. He informed the judge that the defendant claimed to have suffered a complete blackout and loss of memory, induced by excessive consumption of alcohol, as to his activities during the period of time surrounding the crime. The judge stated that he would consider accepting such a plea if the district attorney would recommend it, but the latter responded that he would be opposed to such a disposition and the case went to trial.

During the week prior to trial Mr. Coogan had the defendant examined by a psychiatrist who diagnosed the defendant as an alcoholic who loses control of himself when he drinks and frequently suffers loss of memory as a result of his drinking. The psychiatrist stated, however, that there was no basis for a defense of insanity in the case.

After the trial had been in progress for several days and Ranahan and the medical examiner had completed their testimony and the jury had been shown the photographs of the stab wounds on the victim's body, the defendant became concerned about how that evidence would affect the jurors in their decision of the case on the merits and on the issue of recommendation of mercy. He was afraid of the possibility of a death sentence and also of the possibility of a conviction of murder in the first degree with a mandatory life sentence without the possibility of parole. He then conferred with his lawyer, Mr. Coogan, with the result that he decided to plead guilty to murder in the second degree.

On the basis of his subsidiary findings, the judge who

based on G. L. c. 265, § 2, as amended through St. 1956, c. 731, § 12. For later decisions on the subject of capital punishment, see *Commonwealth* v. *O'Neal,* 369 Mass. 242 (1975), *Furman* v. *Georgia,* 408 U.S. 238 (1972), and the five most recent cases, all decided by the United States Supreme Court on July 2, 1976: *Gregg* v. *Georgia,* 242 U.S. 153; *Jurek* v. *Texas,* 242 U.S. 262; *Proffitt* v. *Florida,* 428 U.S. 242 (1976); *Woodson* v. *North Carolina,* 428 U.S. 280 (1976); *Roberts* v. *Louisiana,* 428 U.S. 325 (1976).

heard and denied the motion to withdraw the guilty plea made the following general findings and conclusions. The decision to plead guilty to murder in the second degree was made by the defendant alone after numerous conferences with his lawyer. It was made with an awareness of all the consequences, and its purpose was to avoid the possibility of a conviction of murder in the first degree. The defendant was adequately represented by counsel who informed him of the elements of murder in the first degree, murder in the second degree, and manslaughter, and that intoxication was a defense to murder in the first degree but not to murder in the second degree. Counsel laid out a series of alternatives without force or coercion. The defendant's decision to plead guilty to murder in the second degree was voluntary; it was made by the defendant after considerable reflection and with a full understanding of the proceedings; and it was made by the defendant to avoid the risk of being found guilty of murder in the first degree. The judge then concluded that the defendant's "offer to plead was voluntary, and a knowing and intelligent waiver of his right to trial," and he dismissed the motion.

1. The defendant's first argument seems to be that at the time he pleaded guilty he was suffering from amnesia and had no recollection of the crime charged against him, that he was therefore incompetent to stand trial or to plead guilty, and it was therefore error to deny his motion, almost six years later, to vacate his plea and sentence. We disagree.

This argument is posited on the assumption that the defendant was suffering from amnesia, a fact which was never found by either the trial judge or the judge who heard the motion. Since there was no agreement on that assumed fact, the defendant had the burden of proving it. It is not enough for the defendant's counsel to allege in his motion that the defendant had amnesia, and then to assume it to be a fact and repeat it many times in the course of his oral argument and in his brief. The only attempted proof of the alleged amnesia was by way of the defendant's

oral testimony at the hearing on the motion. The credibility of that testimony was a preliminary matter for decision by the judge who heard the motion. He apparently did not credit that testimony. He made no finding of amnesia, and his decision thereon as a question of fact is final. *Commonwealth* v. *Bernier,* 359 Mass. 13, 15-16 (1971), and cases cited.

Our conclusion that the argument of incompetency to plead by reason of amnesia has no foundation in the facts found by the judge is not intended to suggest that a bare finding of amnesia in such a case would necessarily require a conclusion that the defendant would be incompetent to stand trial or to plead guilty. There are few reported decisions on this subject and most of them stand for the general rule that a defendant is not rendered incompetent to stand trial by amnesia per se.

In *Commonwealth ex rel. Cummins* v. *Price,* 421 Pa. 396, cert. denied, 385 U.S. 869 (1966), the defendant claimed he had suffered a total and permanent loss of memory of the alleged crime and he asked that the indictment be dismissed or, in the alternative, that trial be stayed until he regained his memory. The request was denied and on appeal the court held (at 406-407): "This defendant... is able to comprehend his position as one accused of murder, is fully capable of understanding the gravity of the criminal proceedings against him, and is as able to cooperate with his counsel in making a rational defense as is any defendant who alleges that at the time of the crime he was insane or very intoxicated or completely drugged, or a defendant whose mind allegedly went blank or who blacked out or who panicked and contends or testifies that he does not remember anything.... If in fact the condition of amnesia is *permanent,* defendant's contention (1) would require Courts to hold that such amnesia will permanently, completely and absolutely *negate all* criminal responsibility, and (2) will turn over the determination of crime and criminal liability to psychiatrists, whose opinions are usually based in large part upon defendant's self-serving statements, instead of to Courts and juries, and (3) will

greatly jeopardize the safety and security of law-abiding citizens and render the protection of Society from crime and criminals far more difficult than ever before in modern history. Unless an accused is legally insane, the law is not and should not be so unrealistic and foolish as to *permanently free, without acquittal* by a Judge or a jury, a person against whom a prima facie case of murder is made out."

For cases involving further discussions and applications of the general rule that amnesia per se does not render a defendant incompetent to stand trial, see *United States* v. *Borum,* 464 F.2d 896, 898-900 (10th Cir. 1972); *United States ex rel. Parson* v. *Anderson,* 354 F. Supp. 1060, 1070-1078 (D. Del. 1972), aff'd, 481 F.2d 94 (3d Cir.), cert. denied, 414 U.S. 1072 (1973); *Bradley* v. *Preston,* 263 F. Supp. 283, 285-286 (D.D.C. 1967), cert. denied, 390 U.S. 990 (1968); *State* v. *McClendon,* 103 Ariz. 105, 107-109 (1968); *Robbins* v. *Florida,* 312 So. 2d 243, 245-246 (Fla. App. 1975), cert. denied, 327 So. 2d 34 (Fla. 1976); and *State* v. *Pugh,* 117 N.J. Super. 26, 35-36 (App. Div. 1971). For a more complete collection of citations of cases and law review articles on this subject, see Annot., Amnesia as Affecting Capacity to Commit Crime or Stand Trial, 46 A.L.R. 3d 544 (1972).

In *Dusky* v. *United States,* 362 U.S. 402 (1960), the United States Supreme Court said that on the issue of competency to stand trial the "test must be whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him." This court quoted that language in applying that test in *Commonwealth* v. *Vailes,* 360 Mass. 522, 524 (1971), involving the same issue. In *Commonwealth* v. *Morrow,* 363 Mass. 601, 607 (1973), we said: "There is nothing in the record to indicate that the defendant was incompetent to stand trial. The same standard should be applied to the acceptance of a guilty plea."

Applying that test or standard to the present case, we

hold that the denial of the defendant's motion to withdraw his plea of guilty was not error, and the result would be no different if he had succeeded in convincing the judge on his claimed lapse of memory of committing the crime charged. The defendant was able to consult with his lawyer about the charge pending against him, to understand what the trial involved and what its consequences might be, and to make intelligent decisions on the several options which were open to him, whether by continuing with his trial or by the entry of a plea of guilty to a reduced charge. He was ably represented and adequately advised by competent counsel after which he alone made the decision to terminate the trial by pleading guilty to a crime which carried a less severe penalty than what he might have received if he were convicted of murder in the first degree. See *Commonwealth* v. *Leate*, 367 Mass. 689, 693-694 (1975); *Commonwealth* v. *Morrow*, 363 Mass. 601, 603-608 (1973); *Parker* v. *North Carolina*, 397 U.S. 790, 794-795 (1970); *Brady* v. *United States*, 397 U.S. 742 (1970).

The facts of the present case are similar in many respects to those in *Huot* v. *Commonwealth*, 363 Mass. 91 (1973). There the defendant was tried on an indictment charging murder in the first degree. Although maintaining that he had no memory of committing any crime, he terminated the trial by pleading guilty to murder in the second degree after hearing the Commonwealth's evidence against him. His claimed loss of memory was related to excessive drinking prior to the commission of the crime. In seeking postconviction relief from the plea he claimed that it "was not made voluntarily but was the result of coercion and terror." *Id.* at 96. He argued that "in the totality of the circumstances of the case, he cannot be considered to have made a voluntary plea especially since he never admitted that he committed the crime." We rejected that argument by saying: "The mere fact that Huot professed innocence, or was unwilling or unable to admit his participation in the killing, would not alone invalidate the guilty plea." *Id.* at 99. This was in accordance with the holding in *North Carolina* v. *Alford*, 400 U.S. 25, 37

(1970), where the Court said: "An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime."

2. The defendant contends that the failure of the trial judge sua sponte to hold a hearing on the defendant's competence to stand trial was error. We do not agree. In arguing this issue the defendant relies heavily on the decision in *Pate* v. *Robinson*, 383 U.S. 375 (1966). In *Commonwealth* v. *Vailes*, 360 Mass. 522, 524 (1971), which involved the question when a trial judge should conduct a hearing on the issue of competence, we said: "In those situations where there exists doubt as to whether the defendant satisfies this test [of competence to stand trial], the judge must, on his own initiative, conduct a full hearing on the issue. *Pate* v. *Robinson*, 383 U.S. 375 [1966]. This doubt which necessitates a hearing has been more fully described as 'a substantial question of possible doubt.' *Rhay* v. *White*, 385 F.2d 883, 886 [1967]." There was no "substantial question of possible doubt" of the defendant's competence to plead guilty in this case, regardless of whether the matter be judged on the basis of what was before the trial judge or on the basis of what was before the judge who later denied the motion to withdraw the plea of guilty. The defendant had a history of anti-social conduct as a juvenile and again while in the military service, and he also had a history of alcoholism and drug addiction. He was committed to the Bridgewater State Hospital from April 23, 1969, to May 21, 1969, for psychiatric observation and at the end of that period he was returned to court with the following report and recommendation: "He has been in good contact with reality during his observation and shows no signs of overt psychosis. He knows the nature of his charges and the possible consequences if convicted, and appears competent to assist his attorney in his own defense. Therefore, his return to court as competent to stand trial is recommended." His

trial started on June 16, 1969. The trial judge was entitled to rely on the Bridgewater State Hospital report and recommendation. Neither the circumstances existing at the start of the trial nor anything which developed up to the time the defendant pleaded guilty several days later required the judge sua sponte to conduct a hearing on the defendant's competence to stand trial or to plead guilty. There was in this case nothing even approaching the long history of heavy drinking, disturbed behavior, irrational and violent conduct, including two homicides and attempted suicide, and prior commitments to a mental institution, which there was in *Pate* v. *Robinson, supra.*

3. The defendant's final argument with reference to his claimed amnesia as rendering him incompetent to stand trial or plead guilty is that by reason of the resulting incompetence there is a "possibility that a defense was lost," the defense being the "possibility that the defendant was the victim of involuntary intoxication." The claim of "involuntary intoxication" in turn is claimed to arise from testimony about a practice of "tabbing" drinks with LSD at the Jamaica Plain apartment mentioned earlier in this opinion. Since we have already concluded that there was no finding that the defendant was suffering from amnesia we are not required to consider what the defendant claims might be a possible consequence of the amnesia if several other possibilities concurred. We will not be drawn into the quagmire of parlaying a string of remote possibilities on the conjured assumption that all might come to pass. The evidence of the possibility of the "tabbing" of drinks with LSD is too speculative and conjectural to be considered further, and we need not consider or discuss whether or how the "involuntary intoxication," if any, would bear on the issue of the defendant's competence to plead guilty in this case.

4. The defendant has argued assignments of alleged errors in seven evidentiary rulings by the judge who heard and denied the motion to revoke the plea of guilty. In view of our holdings and conclusions on the several points dis-

cussed above we may not be required to deal with these evidentiary rulings, but we do so although in any event they are without merit.

a. Five of the alleged errors involve rulings made during the direct examination of the defendant and one of his witnesses who, with the defendant and others, frequented the Jamaica Plain apartment mentioned earlier in this opinion. Two questions which were put to the defendant were excluded. The defendant made no offer of proof to the first and made an unresponsive offer of proof to the second. Three challenged rulings involved questions to the witness. One question brought an unresponsive answer which the judge struck, and this was followed by an unresponsive offer of proof. A second question brought an unresponsive answer which was struck, and there was no offer of proof. A third question was excluded and there was no offer of proof. Such a record does not support a claim of error. The failure to make an offer of proof when it is required is fatal. *Commonwealth* v. *Kleciak,* 350 Mass. 679, 693 (1966). *Commonwealth* v. *Baker,* 348 Mass. 60, 63-64 (1964). *Commonwealth* v. *Farrell,* 322 Mass. 606, 623 (1948). The making of an unresponsive offer of proof is equally fatal. *Hale* v. *Dodge,* 324 Mass. 51, 52 (1949). *Commonwealth* v. *Doyle,* 323 Mass. 633, 637 (1949). *Coral Gables, Inc.* v. *Beerman,* 296 Mass. 267, 268-269 (1936).

b. At the hearing on the motion to revoke his plea, the defendant offered as an exhibit an affidavit of a Boston police officer who appeared to have had some special training and expertise in the field of alcoholism. The affiant stated things which he observed about the defendant for a period prior to and in particular the day following the homicide in question, and then purported to express opinions, as an expert, on alcohol and drug related amnesia. The judge refused to admit the affidavit in evidence. There was no error. The affidavit was not filed with the motion which had been filed on October 8, 1974, but was offered for the first time at the hearing on March 14, 1975. "In accordance with the practice in this Commonwealth motions for new trial in both civil and criminal cases ordi-

narily are heard on the facts as presented by affidavit." *Commonwealth* v. *Coggins,* 324 Mass. 552, 557, cert. denied, 338 U.S. 881 (1949). However, it is also "settled in this Commonwealth that at a hearing on such a motion the judge of the Superior Court may receive oral testimony, affidavits, or both." *Id.* at 556-557, and cases cited. While it is the common practice for a judge hearing such a motion to receive affidavits of factual assertions by the moving party, it does not follow that his refusal to receive a particular affidavit is error. The defendant was not prevented from offering the affiant as a witness. The affiant was a Boston police officer and he was a friend of the defendant's father who was also a Boston police officer. The defendant did not offer the affiant as a witness, nor did he ask for an opportunity to do so.

c. At the same hearing the defendant offered as exhibits what appear to be uncertified photocopies of records of the hospital at Massachusetts Correctional Institution at Norfolk. The first consists of a one page record of the examination of the defendant by an ophthalmologist on December 10, 1972, and it appears to have no relation to the present case. The second is a one page record of a doctor's request that the defendant be evaluated neuropsychiatrically, and it is dated May 25, 1973. The third is a three-page report of a physical examination at the same hospital on May 31, 1973. The only statement of any possible significance to the present case is the following statement under the heading, "Impression": "The patient has had a history of problem with alcohol with blackouts and ETOH hallucinosis."

The defendant contends that these were "records of hospitals" within the meaning of G. L. c. 233, § 79, and therefore admissible. Assuming they were such records, they would be admissible under the statute only in the court's discretion, and only if they were authenticated by some person having custody thereof or were certified in some fashion as prescribed by the statute. These records were not authenticated or certified, and the defendant offered no evidence to authenticate them. The judge gave

no reason for excluding the proffered records. They were clearly excludable on the ground that they were neither authenticated nor certified, and in any event their admissibility was at the discretion of the judge and he did not abuse his discretion. There was no error.

We think it appropriate to note at this point that although the defendant had a hospital record marked for identification at the hearing on the motion, he did not thereafter take the necessary action to have that record reproduced in the record on appeal or otherwise forwarded to this court for consideration of the alleged error in its exclusion. *Commonwealth* v. *Stewart,* 365 Mass. 99, 106 (1974). It is true that the defendant did reproduce in his brief the purported hospital records covering three different dates as noted above, but we cannot be certain that they are the records offered at the hearing. In offering one of the records at the hearing counsel for the defendant described it as "a report of a neurologic examination of the defendant which occurred on June 13th, 1973, in Norfolk Prison."

5. For all the reasons stated above, we hold that the defendant's motion to vacate his sentence and that he be permitted to withdraw his plea of guilty was properly denied.

> *Order denying motion to vacate*
> *sentence and withdraw plea*
> *of guilty affirmed.*