## Commonwealth vs. Richard Bertrand.

Bristol. September 15, 1981. — February 25, 1982.

Present: Hennessey, C.J., Wilkins, Liacos, Abrams, Nolan, & Lynch, JJ.

*Homicide. Self-Defense. Practice, Criminal,* Instructions to jury, Assistance of counsel, Capital case.

At a murder trial, no substantial likelihood of a miscarriage of justice resulted from the judge's not instructing the jury on self-defense or provocation where there was nothing in the evidence to support such instructions. [361-363]

A claim of ineffective assistance of counsel for the defendant in a criminal case failed where the defendant made no showing that trial counsel's pretrial preparation in any way prejudiced his cause. [364-366]

At a murder trial, a defendant was not denied effective assistance of counsel by his attorney's alleged failure to discuss a plea bargain with him before trial. [366]

A defendant in a murder trial was not denied effective assistance of counsel on the basis of alleged errors in trial counsel's conduct of the trial where the defendant failed to demonstrate that his counsel's decisions were illogical, incomprehensible or, in the circumstances, incorrect. [366-369]

Indictment found and returned in the Superior Court on November 3, 1976.

The case was tried before *McGuire*, J., and a motion for a new trial was heard by him.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Thomas F. Heffernon* for the defendant.

*Phillip L. Weiner,* Assistant District Attorney, for the Commonwealth.

Lynch, J. The defendant, Richard Bertrand, was convicted of murder in the second degree. After a hearing, the trial judge denied his motion for a new trial, and we trans-

ferred his appeal from that denial to this court on our own motion. His concurrent claim of appeal under G. L. c. 278, § 33E,[1] raises substantially the same issues as his appeal from the denial of his motion for a new trial.[2] We treat both appeals as properly before this court. We have reviewed the entire record, including the transcripts, of the defendant's conviction under G. L. c. 278, § 33E. We find no abuse of discretion in the denial of the defendant's motion, and in addition, no error or injustice warranting the exercise of our powers under G. L. c. 278, § 33E.

On November 3, 1976, the defendant, Richard Bertrand, and a codefendant, David Reis, Jr., were indicted for the murder of Joseph "Duke" Rimmer. The trial commenced on January 31, 1977, in the Superior Court in Bristol County. On February 1, 1977, the second day of the trial, Reis pleaded guilty to manslaughter and subsequently became the Commonwealth's chief witness against Bertrand. On February 7, 1977, the jury returned a verdict of guilty of murder in the second degree against Bertrand, who was then sentenced to the Massachusetts Correctional Institution at Walpole for life.

---

[1] The Legislature amended G. L. c. 278, § 33E. As a result the extraordinary relief made possible by that section is now limited to cases resulting in convictions of murder in the first degree. St. 1979, c. 346, § 2. We have previously determined that review remains available when the offense for which the defendant was convicted was committed before July 1, 1979. *Commonwealth* v. *Davis*, 380 Mass. 1, 15 (1980). We assume, for the purpose of deciding this case, that in prosecuting his direct appeal the defendant took the steps necessary to qualify for relief under G. L. c. 278, §§ 33A-33G, as those statutes specified before the 1979 amendment.

[2] The defendant, acting through prior counsel, filed as part of his direct appeal an assignment of errors. We have not received a separate brief relating to this direct appeal. The errors alleged involved the judge's jury instruction regarding manslaughter, the instruction regarding joint enterprise and the admission of certain testimony of the medical examiner who examined the victim's body. We consider below the defendant's arguments involving the manslaughter charge; we find no merit in the other two assignments of error. The defendant's current appellate counsel, in a letter to this court, has waived any further briefing or oral argument on the issues raised by the defendant's direct appeal.

The defendant, in his motion for a new trial, alleged that he was deprived of the effective assistance of counsel and that the judge's charge regarding manslaughter and joint enterprise was inadequate and prejudicial in material respects. Since the inadequacy of the charge regarding joint enterprise has neither been briefed nor argued before us, the defendant has waived that claim of error. Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). *Town Taxi Inc.* v. *Police Comm'r of Boston*, 377 Mass. 576, 579 (1979). We have nevertheless considered this issue as part of our G. L. c. 278, § 33E, review and find the defendant's argument without merit.

The facts gleaned from the record are as follows. Bertrand and Reis, both age twenty-one at the time of the murder, had been friends since childhood. At approximately 11 A.M. on September 11, 1976, Bertrand met Rimmer, the victim, at Pidgeon's Cafe, a bar in Fall River. Rimmer, forty-two, was apparently a friend of Bertrand and had called Bertrand that morning to invite him to the bar.

Bertrand, Rimmer, and a third person later travelled to the Morgan Street Cafe, also in Fall River, arriving about 12:30 P.M. Bertrand and Rimmer talked and drank schnapps until 6 P.M. Around 2:30 P.M., the subject of physical strength came up. When Bertrand claimed that he had been lifting weights of 325 pounds, Rimmer suggested that a good test of Bertrand's toughness was to see whether Bertrand could stand up to four of Rimmer's best punches to the stomach. Bertrand agreed. After Bertrand "took his shots," the proprietor of the bar encouraged Bertrand and Rimmer to keep the peace. Bertrand and Rimmer continued talking and drinking until both left the bar.

Reis, who did not like Rimmer, was in the same bar for most of the afternoon. Bertrand told both Reis and Rimmer that he intended to spend the evening at the T-Sans Seafood Hut (T-Sans), another bar in Fall River. The three left the Morgan Street Cafe separately. Although they had reached no specific agreement, all three had arrived at T-Sans by 10:45 P.M.

When Bertrand and a woman companion appeared at T-Sans at approximately 10 P.M., Rimmer was already there. Rimmer told Bertrand that he expected a "tune-up night"; shortly thereafter, Bertrand informed Detective Sergeant Paul Carey of the Fall River police department, who was on special duty at the door of T-Sans, that "me and Duke [Rimmer] might have a fight" that night. According to Bertrand, Sergeant Carey told him to "take it outside."

About 11 P.M., Rimmer, who was seated at a table near the rear door of T-Sans, motioned Bertrand over to his table. Reis had entered through the rear door of the bar a few minutes before and was standing in front of Rimmer's table when Bertrand came over. Rimmer told Bertrand "not to . . . take things . . . too serious and try to feel like a hero because of taking them four shots . . . earlier." Bertrand replied, "Duke, if you want to carry things on, if you want to go at it, we will go out." Rimmer stood up and walked out the back door of T-Sans, preceded by Bertrand and followed by Reis.

The rear exit from T-Sans could be approached from the inside only through a passageway, which prevented patrons inside the club from witnessing the events that occurred just outside the back door. This door normally was barred by a thirty-inch two-by-four board: the door opened outward, and the board was held against the door by brackets bolted to the door. On this evening, however, the weather was warm and the board was braced against the back door to hold it open. Between the doorsill and the ground were several steps.

At this point, Bertrand's and Reis's accounts diverge. Bertrand testified that as Rimmer lunged toward him from the door, Bertrand turned and struck Rimmer in the face with his fist. Bertrand then charged Rimmer, rammed Rimmer in the chest with his head, knocked Rimmer over backward and fell astraddle of him. As Rimmer, lying on his back, pushed Bertrand's shoulders down and away from Rimmer's chest, Bertrand heard a crack and felt Rimmer go limp. Bertrand looked up to see Reis swinging the board at Rimmer's head for the second time.

Reis, on the other hand, testified that Bertrand swept up the board as Bertrand was descending the steps and, swinging it like a baseball bat, turned and struck Rimmer on the forehead as Rimmer followed Bertrand down the steps. According to Reis, Bertrand then dropped the board. Reis got between them and pushed Bertrand and Rimmer apart; Rimmer fell. Reis then picked up the board and struck Rimmer repeatedly in the head with it, while Bertrand kicked and stomped Rimmer.

Bertrand, who insisted that he hit Rimmer only once and only with his fist, testified that Reis struck him on the wrist with the board as Bertrand was attempting to protect Rimmer from Reis's blows. Sergeant Carey and other officers testified that Bertrand later drew their attention to his bruised wrist; the officers considered the injury minor and Bertrand received no medical treatment.

Sergeant Carey observed Reis drive away from the scene a few minutes after the incident. Bertrand, after asking someone to tell Sergeant Carey that Rimmer was hurt, went home and changed his clothing and shoes. A short time later, at approximately 1:30 A.M. on September 12, 1976, Bertrand returned to T-Sans and admitted to police that he had been fighting with Rimmer. At first, Bertrand gave the officers essentially the same account of the incident that he related at trial, but claimed that Reis was not involved and that Rimmer's assailant was an unidentified member of a local motorcycle club. Bertrand claimed that he had chased the assailant over a fence behind the T-Sans parking lot and had thrown the bloody board after him.

Bertrand pointed out the location of the board and allowed officers to go to his home and take possession of the clothes and shoes he had been wearing during the incident. Forensic examination revealed no blood on Bertrand's clothing; a spot of blood with a blood type corresponding to that of the victim was detected on the heel of one shoe. Rimmer died later that morning of massive skull fractures. Shortly thereafter, Bertrand told police that Reis had inflicted the blows which killed Rimmer.

Bertrand testified that "me and Duke had an agreement . . . to go out and have a fight, more or less like two brothers . . . fighting." He also testified that "I figured that's what it was coming down to, either he beat me or I beat him, one or the other."

Reis stated that he "never liked Duke. He was a bully." Reis admitted that, while he was beating Rimmer with the board, he did not intend that Rimmer should get up; he did not admit intending to kill Rimmer. There were no witnesses to the encounter other than Reis and Bertrand.

1. *The manslaughter charge.* The defendant contends that the judge erred in not charging the jury on those factors which could mitigate the offense of murder to that of manslaughter. Specifically, he asserts that the judge should have charged the jurors that if they found that the defendant acted in self-defense but used excessive force, they should find him guilty of voluntary manslaughter. Because the defendant raised no objection at the trial to the judge's failure to instruct on self-defense, the question before this court is whether the charge given created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Zaccagnini*, 383 Mass. 615, 617 (1981). *Commonwealth* v. *Freeman*, 352 Mass. 556, 564 (1967). We find none.

The judge charged the jury on murder in the first degree, murder in the second degree, manslaughter,[3] and assault and battery. He did not instruct the jury specifically with respect to "'combat,' 'passion' or 'heat of blood,'" *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 746 (1975), factors which, if found to exist, might have mitigated the offense of murder to that of manslaughter. See *Commonwealth* v.

---

[3] The manslaughter charge was as follows: "In regard to manslaughter. A defendant who commits an unjustified battery which happens to cause death, may be guilty of manslaughter. Wanton or reckless conduct is the legal equivalent of intentional conduct, and if bodily injury is thereby caused to another, the result is assault and battery. And since manslaughter is simply a battery that causes death, if death results from wanton or reckless conduct, the result is manslaughter." The language is taken almost verbatim from *Commonwealth* v. *Welansky*, 316 Mass. 383, 401 (1944).

*Caine,* 366 Mass. 366, 375 (1974); *Commonwealth* v. *Soaris,* 275 Mass. 291, 299 (1931). Nor did the judge instruct the jury on self-defense, either as a factor which might preclude a finding that the victim's death was a criminal homicide (if the jury found that the defendant was justified in killing his assailant), see *Commonwealth* v. *Barnacle,* 134 Mass. 215 (1883), or as a factor mitigating the offense of murder to that of manslaughter. See *Commonwealth* v. *Gagne,* 367 Mass. 519, 526 (1975). The defendant asserts that the judge erred in not instructing the jury with respect to self-defense and other possible mitigating factors.

We have held, in light of *Mullaney* v. *Wilbur,* 421 U.S. 684 (1975), that, when the evidence in a murder case is such that it could raise a reasonable doubt in the minds of the jurors whether the defendant acted in self-defense, the Commonwealth bears the burden of demonstrating the absence of self-defense, and a trial judge must give an appropriate instruction to that effect. *Commonwealth* v. *Fluker,* 377 Mass. 123, 127 (1979). *Commonwealth* v. *Rodriguez,* 370 Mass. 684, 687-688 (1976). The judge's decision not to give such an instruction in this case, however, was a proper one.

Before a defendant is entitled to an instruction on self-defense, there must be evidence that he first took advantage of every reasonable opportunity to avoid the combat. See *Commonwealth* v. *Mains,* 374 Mass. 733, 736 (1978); *Commonwealth* v. *Lacasse,* 365 Mass. 271, 273 (1974); *Commonwealth* v. *Kendrick,* 351 Mass. 203, 212 (1966). Bertrand did not attempt to avoid a fight with Rimmer. On the contrary, Bertrand told Sergeant Carey that he anticipated a fight that evening, and Bertrand remained at T-Sans until Rimmer was lying unconscious in the parking lot.

Further, Bertrand insisted that he did not inflict the blows which killed Rimmer; his testimony raised no issue of self-defense. Reis, on the other hand, asserted that Bertrand struck Rimmer as Rimmer was passing through the doorway and before Rimmer set foot in the parking lot; this testimony left Bertrand no opening for a viable claim of self-

defense. A charge on the issue of self-defense would have had no basis in the evidence, and we hold that it was properly omitted. *Commonwealth* v. *Walden*, 380 Mass. 724, 726-727 (1980). *Commonwealth* v. *Vanderpool, supra*.

Charges on the mitigating factors of "combat," "passion," and "heat of blood" also would have been without support in the evidence. As Bertrand testified, Rimmer at most "put his hand up to swing" before Bertrand knocked him to the ground. Although Bertrand and Reis disagreed regarding whether the first blow was delivered with board or fist, both testified that Rimmer never made it off the ground after that blow. There was testimony that Rimmer was taller and heavier than either Bertrand or Reis, and that Rimmer had a reputation as a brawler. This evidence, however, viewed in light of the testimony regarding the events that occurred that night, does not "warrant a reasonable doubt that something happened which would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." *Commonwealth* v. *Walden, supra* at 728. Bertrand and Rimmer did exchange words before the incident, but "[i]nsults or quarreling alone cannot provide a reasonable provocation." *Commonwealth* v. *Zukoski*, 370 Mass. 23, 28 (1976), and cases cited. We hold, therefore, that there was no error in not charging the jury on self-defense or provocation.

2. *Effective assistance of counsel.* The defendant asserts that he was deprived of the effective assistance of counsel, in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, because of a series of alleged lapses and errors of his trial counsel. In order to determine the validity of the defendant's claim, we must examine "the specific circumstances of the . . . case to see whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an

ordinary fallible lawyer — and, if that is found, then . . . whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Accord, *Commonwealth* v. *Daigle*, 379 Mass. 541, 544 (1980); *Commonwealth* v. *Rondeau*, 378 Mass. 408, 413 (1979).

The defendant asserts that his trial counsel's conduct deprived him of the opportunity to claim self-defense, and, in the alternative, to decline to take the stand and to put the Commonwealth to its proof, relying on proper argument to demonstrate that the Commonwealth had not carried its burden. In addition, the defendant contends that his trial counsel's alleged failure to seek a reduced sentence by means of a plea bargain with the Commonwealth prejudiced him. The defendant raises other objections to trial counsel's conduct; we consider the defendant's specific allegations below.

a. *Trial preparation.* The defendant asserts that his trial counsel failed to investigate the facts of the case and failed to seek discovery from the Commonwealth which would have revealed impeachment evidence in the form of Reis's criminal and psychiatric records and prior inconsistent statements made by Reis in response to the questions of a polygraph examiner. In support of these assertions, and of the claim that his trial counsel failed to develop a proper attorney-client relationship with him, the defendant testified at the hearing on his motion for a new trial that his trial counsel met with him "[p]ossibly three [times] at the most" for a total of approximately twenty-five minutes. Trial counsel did not testify at the hearing. The judge denied the defendant's motion without making findings of fact.

"To the extent that the defendant's motion [for a new trial] was based on facts which were neither agreed upon nor apparent on the face of the [trial] record, he had the burden of proving such facts." *Commonwealth* v. *Bernier*, 359 Mass. 13, 15 (1971). At the hearing on the motion for a new trial, the judge was not compelled to accept the defendant's testimony as true: the defendant's credibility, like that of any other witness, was a preliminary matter for the

judge and his decision on that matter is final. *Id.* at 16. *Commonwealth* v. *Hubbard*, 371 Mass. 160, 169 (1976). *Commonwealth* v. *Heffernan*, 350 Mass. 48, 53, cert. denied, 384 U.S. 960 (1966).

In any event, the defendant's testimony regarding his limited contact with his trial counsel before trial, if believed, would warrant neither a new trial nor a reduced sentence for the defendant without some showing that the defendant was deprived of an otherwise available, substantial ground of defense. The evidence in the case and the theories available to the defense were not complex. Since Bertrand had posted bail, he was free to visit trial counsel at his office or to discuss the case during a recess. The defendant sat next to his counsel at the trial and met with him at least once during the trial before testifying. Here, as in *Commonwealth* v. *Saferian, supra* at 98, "[i]t is hard to believe that in the end any aspect of the matter plausibly helpful to the defendant was ignored or skimped."

Even if the defendant's trial counsel did not formally seek discovery from the Commonwealth,[4] our review of the transcripts nonetheless convinces us that this did not deprive the defendant of any substantial ground of defense. Trial counsel stated at one point in the trial that he had received some discovery with respect to a report given to the police by a witness then testifying. In addition, it can be inferred from trial counsel's cross-examination of other witnesses that he had studied statements made by these witnesses before the trial.[5] The defendant insists that his trial counsel should

---

[4] At the hearing on his motion for a new trial, the defendant introduced a copy of the docket of his case. The docket contained no entries indicating that the defendant's trial counsel had sought or received discovery from the Commonwealth.

[5] The Commonwealth moved to enlarge the record appendix to include certain letters from the trial prosecutor to the defendant's trial counsel regarding records sent to trial counsel. The trial transcripts however, contain evidence sufficient to allow us to conclude, without considering the supplementary materials submitted by the Commonwealth, that the absence of a formal motion for discovery could not have affected the defendant adversely.

have conducted further investigation, but does not indicate what facts favorable to the defense might have been disclosed by a more complete investigation. "Speculation that such facts existed is not enough to support this claim." *Commonwealth* v. *Bolduc*, 375 Mass. 530, 540 (1978). The defendant has failed to demonstrate, therefore, that trial counsel's pretrial preparation in any way prejudiced the defendant's cause.

b. *Failure to plea bargain.* The defendant has alleged that he was deprived of effective assistance of counsel because his trial counsel failed to negotiate a plea bargain with the Commonwealth. It should be noted, however, that the defendant's claim is controverted by his own testimony: Bertrand admitted during the hearing on the motion for a new trial that his trial counsel had discussed with him, during the trial, the possibility of a plea bargain. The defendant's claim must therefore be limited to his trial counsel's alleged failure to discuss a plea bargain with his client before trial. On the facts of this case we hold that this alleged lapse, even if proved, would not constitute ineffective assistance of counsel.[6] Nor does the disparity in the sentences received by Bertrand and Reis warrant the exercise of our powers under G. L. c. 278, § 33E. *Commonwealth* v. *Brown*, 378 Mass. 165, 173 (1979). *Commonwealth* v. *Hooks*, 375 Mass. 284, 298-299 (1978). *Commonwealth* v. *Simpson*, 370 Mass. 119, 126-127 (1976).

c. *Trial conduct.* The defendant alleges that he was prejudiced by his trial counsel's failure to produce available witnesses favorable to the defense. At the hearing on his motion for a new trial, the defendant mentioned only one potential witness whose name and address he claimed to have given to his trial counsel. This witness was not present at T-Sans on the night of the murder, although he had been with Bertrand and Rimmer earlier that day at the Morgan

---

[6] We do not reach the question whether a failure to plea bargain can ever be said to deprive a defendant of a "substantial ground of defence." *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974).

Street Cafe. The defendant did not indicate what this potential witness's testimony would have encompassed. We do not comprehend how this testimony, assuming it to be available, could have furthered the defendant's cause. *Commonwealth* v. *Adams*, 374 Mass. 722, 730-731 (1978). See *Commonwealth* v. *Coleman*, 366 Mass. 705, 715 n.2 (1975).

The defendant also claims that his trial counsel failed to impeach the prosecution's chief witness, David Reis, with Reis's criminal and psychiatric records and with prior inconsistent statements made in response to questions asked during a polygraph examination. The defendant has not left us with a record upon which we could conclude that Reis had a history of psychiatric treatment or that records of such treatments, if they exist, would be admissible. Reis's criminal record included ten convictions: four motor vehicle violations, three convictions of assaultive crimes, and three other convictions.[7]

With regard to impeachment, the record reveals extensive cross-examination of Reis which brought forth admissions that Reis had pleaded guilty to a manslaughter charge in connection with Rimmer's death, that the prosecutor had agreed to seek an eighteen-year sentence, and that Reis expected to serve only two or three years of that sentence. This cross-examination also elicited Reis's statement that he "never liked Duke. He was a bully," and Reis's account of striking Rimmer repeatedly in the head and body with the board, intending to prevend Rimmer from getting up again. Reis's cross-examination revealed that Reis unaccountably had no memory of important moments during the beating. In short, trial counsel attacked Reis's credibility directly with respect to his account of the events of the night in question.

From all that appears in the record, trial counsel may have decided that introducing Reis's criminal record would not further the defendant's case. If so, that decision was a

---

[7] Two convictions of breaking and entering in the night time and one of possession of a class D controlled substance.

tactical one, and within the range of acceptable trial tactics. See *Commonwealth* v. *Daigle*, 379 Mass. 541, 544-546 (1980). Review of tactical decisions "is not to be made with the advantage of hindsight, and any violation of the attorney's duty must be both substantial and prejudicial." *Commonwealth* v. *Adams*, 374 Mass. 722, 729 (1978). Accord, *Commonwealth* v. *Williams*, 378 Mass. 217, 239 (1979). Especially since counsel had established that Reis pleaded guilty to a manslaughter charge arising out of the very incident for which the defendant was on trial, evidence of Reis's criminal record would have been merely cumulative. If trial counsel erred in failing to introduce Reis's criminal record, that error could not reasonably be supposed to have harmed the defendant.

The defendant's assertion that he was prejudiced by his trial counsel's failure to use Reis's prior inconsistent statements also falls into the category of tactical decisions. Trial counsel reasonably could have decided that, in light of Reis's testimony regarding his active involvement in the crime, the prior inconsistent statements could have little impeachment effect.

Other alleged errors in trial counsel's approach to the trial provide similar examples of appellate counsel's attempt to demonstrate the undemonstrable.[8]   The defendant has not shown that trial counsel's decisions were illogical, incomprehensible or, in the circumstances, incorrect. The defendant's ineffective assistance of counsel arguments are not to be analyzed in a vacuum, but in light of what a reasonably proficient trial lawyer properly may have considered to be a reasonable trial strategy.   We decline to second guess trial

---

[8] The defendant contends, for instance, that his trial counsel erred in failing to move for a required finding of not guilty. "Effective assistance is not measured by trial counsel's willingness to indulge every available procedure no matter how futile." *Commonwealth* v. *Brady*, 380 Mass. 44, 56 (1980). The futility of a motion for a required finding of not guilty is demonstrated, in this case, by the failure of the defendant to argue that the jury's verdict is unsupported by the evidence. See *Commonwealth* v. *Servidori*, 6 Mass. App. Ct. 969 (1979).

counsel with respect to reasonable, although not ultimately successful, trial strategies.

We have examined the transcript of trial counsel's closing argument and find no error, nor any other factor that warrants the exercise of our powers under G. L. c. 278, § 33E. The defendant's trial counsel argued that Reis killed Rimmer, that Bertrand was Rimmer's friend and Reis disliked Rimmer, and that Bertrand's cooperation with the police on the night of the crime supported his version of the events. Counsel attempted to explain Bertrand's initial flight from the scene by reference to Bertrand's past encounters with the police and Bertrand's resulting fear that the police would not believe his account of the incident. Counsel stressed Bertrand's claim that he had been injured while protecting Rimmer from Reis's blows. He tried to undermine Reis's account of the delivery of the initial blow by a detailed examination of Bertrand's and Rimmer's respective heights, the height of the stairs leading down from the rear door, and the length of the two-by-four murder weapon.

In short, the defendant's trial counsel played every card available to the defendant. No juror could have been misled by trial counsel's final sentences[9] into believing that the jury were not being asked to return a verdict of not guilty. The guarantee of effective counsel is not a guarantee of a favorable verdict for the defendant. The judge did not abuse his discretion in denying the defendant's motion for a new trial.

*Judgment affirmed.*

*Denial of motion for a new trial affirmed.*

---

[9] Trial counsel closed his final argument with, "Now, as is the usual custom, I would not ask you to come back with a not guilty, I would simply ask you to do the justice that I am sure you will do."