### COMMONWEALTH *vs.* JASON JILES.

Hampden. May 6, 1998. - July 22, 1998.

Present: WILKINS, C.J., LYNCH, FRIED, MARSHALL, & IRELAND, JJ.

*Practice, Criminal,* Instructions to jury. *Malice. Witness,* Impeachment. *Evidence,* Hearsay.

At a murder trial, no substantial likelihood of a miscarriage of justice was created by the judge's instructions on murder in the first degree by reason of deliberate premeditation, which correctly conveyed to the jury the concepts of deliberate premeditation and first prong malice [70-72]; and inclusion within the instructions of a description of all three prongs of malice did not create a substantial risk of a miscarriage of justice where, based on the evidence presented at trial, the jury could not have concluded that the murder was anything other than premeditated [72-73].

At a murder trial, error, if any, in the admission, for purposes of rehabilitation, of an entire pretrial written statement of a witness, which contained incriminating hearsay remarks, did not create a substantial likelihood of a miscarriage of justice, in light of the judge's limiting instructions on the jury's use of the statement and the overwhelming evidence against the defendant. [73-75]

INDICTMENTS found and returned in the Superior Court Department on May 12, 1995.

The cases were tried before *William H. Welch,* J.

*Randolph Gioia* for the defendant.

*Jane Davidson Montori,* Assistant District Attorney, for the Commonwealth.

IRELAND, J. The defendant, Jason Jiles, was found guilty of deliberately premeditated murder in the first degree for the shooting death of Carlos Falcon. The defendant also was found guilty of three indictments charging armed assault with intent to murder, G. L. c. 265, § 18 (*b*), and assault and battery by means of a dangerous weapon, G. L. c. 265, § 15A, for the shootings of Falcon's three companions.

The defendant appeals from all seven convictions but raises claims of error that relate only to the murder conviction. First, the defendant claims that the jury instructions on deliberate

premeditation (to which he made no objection at trial) were faulty because (a) the judge never explicitly informed the jurors that conviction of premeditated murder in the first degree requires a finding of "specific intent" on the part of the defendant to kill the victim (i.e., first prong malice); and (b) the judge erroneously instructed jurors on all three prongs of malice[1] in connection with his instructions on premeditation. Second, the defendant claims that the judge committed reversible error by admitting in evidence a prior statement of a key prosecution witness that included powerfully incriminating hearsay statements, made to that witness by the defendant's alleged accomplice, that the defendant had killed the victim. Objection was not made on hearsay grounds. Finding that no substantial likelihood of a miscarriage of justice has occurred, we affirm the defendant's convictions. We also decline relief under G. L. c. 278, § 33E.

The jury could have found the following. The defendant, at the time of the shooting, was nineteen years old. He aspired to become a member of Los Solidos (The Solids), one of several rival gangs that operate in the city of Springfield. The defendant belonged to the Solids' Original Family Organization (OFO), an apprentice-like group, membership in which generally preceded membership in the Solids. An OFO member could become a full-fledged Solids member by carrying out on behalf of the gang a "mission," meaning beating up or shooting someone (usually a rival gang member).

One member of the Solids, Daniel Rodriguez, was a witness for the Commonwealth. Rodriguez testified that on the evening of February 28, 1995, the date of the shootings, members of OFO and the Solids met at the apartment of Sharleen Alvarez, the defendant's girl friend, purportedly to install a new leader, or president, of OFO. The defendant was among those who were present, as was Rodriguez. The meeting was interrupted when two Solids members entered the apartment shouting that members of a rival gang, the Latin Kings (Kings) were downstairs on the street "flashing signs" — making gestures of

---

[1]Malice can be shown by an intent to kill the victim (first prong), or an intent to do grievous bodily harm (second prong). *Commonwealth* v. *Sneed*, 413 Mass. 387, 388 n.1 (1992). In addition, "malice aforethought may be inferred if, in the circumstances known to the defendant, a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act." *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987).

disrespect toward the Solids and challenging the Solids on their own turf.

Several Solids members and OFO members met behind closed doors in the apartment's bathroom at the direction of the Solids' "chief enforcer" in order to decide what to do about the Kings' challenge. A short time later, the OFO enforcer dismissed everyone from that meeting except for the defendant and Mack Brown, the "war lord" for OFO. Rodriguez had often seen Brown with a .38 caliber revolver.

A short time later, Rodriguez saw the defendant in the apartment holding a .22 caliber semiautomatic gun. The defendant said, "I'm going to take care of it." He donned a hooded sweatshirt and left the apartment. At about the same time, Mack Brown also left the apartment. From a window in the apartment Rodriguez saw the defendant below in the parking lot of a Kentucky Fried Chicken (KFC) restaurant. Momentarily, the defendant looked up toward the apartment window and gestured that there was "nothing down there."

The defendant returned to the apartment and told the OFO enforcer that the men in the KFC parking lot did not appear to him to be Kings. The enforcer insisted that they were and told the defendant to return to the parking lot and "take care of it." The defendant left the apartment.

In two separate signed statements given to the police during their investigation of the crime, the defendant described what had happened in the parking lot and just previously in the apartment. The OFO enforcer had handed the defendant a small semiautomatic gun in the apartment. While standing in the parking lot, the defendant saw four men inside the KFC restaurant and a Toyota automobile parked outside which appeared to belong to the four. The defendant did not believe that the four men were from a rival gang because they had not posted a look-out. He checked back with the enforcer who told him to "do the car up when they [the four men] came out." The defendant understood that the enforcer wanted him to shoot the men.

Returning to the parking lot, the defendant walked over and stood near a parked van. Several minutes later, the four men came out of the restaurant and approached the Toyota. All, except for Falcon, got into the car. Falcon stood outside at the rear of the vehicle. At that point, a heavy set black man, whom the defendant identified in his second statement as Mack Brown,

approached the vehicle and started a conversation with Falcon. The black man then pulled out a gun and fired several shots into the car. When the defendant heard the gunshots, he stepped forward toward the car, pointed his gun in that general direction and fired a single shot.

Falcon died from a single bullet fired to the back of his head. The three men inside the car were wounded. Each man testified at the defendant's trial. None of them could identify the defendant as being present at the shooting. Two of them gave a detailed description that matched the description that the defendant offered at trial of the man who had shot them. All three said that the shooter had only one gun; one of them believed that that gun was a .38 caliber revolver.

Daniel Rodriguez, the Commonwealth's witness, testified that, when the defendant returned again to the apartment, he was sweating and appeared "nervous, paranoid." Everyone in the apartment gave the defendant "full props," or congratulations for, as Rodriguez believed, having carried out "the mission." Rodriguez thought that the defendant was made a member of the Solids at that moment. About twenty minutes later, Mack Brown returned to the apartment. He bought some marihuana and left again. Rodriguez later heard from Brown that he planned to leave the Springfield area.

Police officers arrived at the apartment a short while later. They identified and photographed the people there and arrested Rodriguez on an outstanding warrant. One of the officers saw that the defendant was "sweating," "very edgy," and "nervous." Other officers who investigated the crime scene recovered a .22 caliber shell casing near the rear of the vehicle about two feet away from Falcon's body. During the autopsy, a .22 caliber bullet was removed from Falcon's head. Other spent bullets that were recovered from the crime scene or from the bodies of the three wounded victims were all .38 caliber and, according to the Commonwealth's ballistics expert, had all been fired from the same gun.[2] The ballistics expert, however, was unable to offer an opinion as to the distance from which Falcon had been shot.

---

[2]No .38 shell casings were recovered at the scene. The ballistics expert testified that, typically, .38 caliber revolvers hold six bullets but do not eject the bullet casings when the weapon is fired. At trial, the Commonwealth offered evidence to account for, and directly link to the crime, all six .38 caliber bullets. By contrast, semi-automatic weapons of the sort the defendant admitted having in his possession eject the bullet casings.

On May 3, 1995, approximately two months after the shootings, the defendant voluntarily met with, and was questioned by, Springfield police officers. He gave two signed statements to the officers concerning his part in the incident. In some respects, the statements were generally consistent with one another and with the testimony that the defendant gave at trial. For example, the defendant consistently conceded that he had been present at a Solids meeting at Alvarez's apartment that night; that he had been asked by the Solids' OFO enforcer to check on possible rival gang members who had been seen moments before in the KFC parking lot; that he had a gun when he went to the parking lot; and that he had seen a third party fire a gun at the Toyota and the four men. In the second statement, which the defendant gave after admitting to the officers that he had not been entirely truthful in the first one, the defendant identified the third-party shooter as Mack Brown. In addition, he stated that, when Mack Brown fired a volley of gunfire at the four men, he (the defendant) stepped forward toward the Toyota, pointed his gun in that direction and fired one round. At trial, the defendant denied that he had fired his weapon, did not identify Mack Brown as the assailant with the .38 caliber weapon, and claimed that he had signed the second statement without having read it. He claimed that the police officers fabricated the part about his firing a shot.

1. *Instructions on deliberate premeditation.* At trial, the Commonwealth proceeded exclusively on the theory that the defendant had acted with deliberate premeditation with the intent to kill the victim when he fatally shot Falcon in the back of the head. The judge instructed the jury on murder in the first degree committed with deliberate premeditation but gave no instructions on murder in the first degree committed with extreme atrocity or cruelty, as the Commonwealth had not pursued that alternate theory at trial. The judge also instructed the jury on murder in the second degree as he was required to do. See *Commonwealth* v. *Brown*, 392 Mass. 632, 645 (1984).

The defendant claims error on two fronts in the instructions on murder in the first degree by reason of deliberate premeditation: first, the instructions failed to include the precise words that the defendant "specifically intended to kill the victim"; second, they included a description of all three prongs of malice. According to the defendant, the jury possibly could have convicted him erroneously on the third (or second) prong of

malice, rather than on the first prong of malice as is required for premeditated murder in the first degree. See *Commonwealth* v. *Diaz*, 426 Mass. 548, 553 (1998); *Commonwealth* v. *Waite*, 422 Mass. 792, 804-805 (1996), and cases cited. At trial, no objection was raised concerning the instructions. Hence, we review the claim only to determine whether any error in the instructions resulted in the substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Barros*, 425 Mass. 572, 577-578 (1997); *Commonwealth* v. *Torres*, 420 Mass. 479, 482-483 (1995).

"We . . . evaluate the charge as a whole, looking for what meaning a reasonable juror could put to the words of the trial judge." *Commonwealth* v. *Waite, supra* at 804. What matters most is the reasonable impression jurors have derived from the instructions as to their fact-finding functions and whether ambiguities in, or omissions from, the instructions created an impermissible presumption in jurors' minds. *Commonwealth* v. *Gibson*, 424 Mass. 242, 248, cert. denied, 521 U.S. 1123 (1997); *Commonwealth* v. *Doherty*, 411 Mass. 95, 105 (1991), cert. denied, 502 U.S. 1094 (1992).

When read as a whole, the instructions unambiguously conveyed to the jury the requirements for conviction of premeditated murder in the first degree: (1) The defendant "formed some kind of a plan to murder"; (2) the "decision to kill" came about after contemplation and premeditation; and (3) the "resolution to kill" was the product of "cool reflection." The judge further instructed that deliberate premeditation requires the defendant to have "thought about the act before he acted," but that deliberate premeditation could have occurred within "a matter of seconds." The judge summed up, stating, "It's not so much any particular period of time as [it is] of logical intention: First, the deliberation, the contemplation and the premeditation, then *the decision to kill* and, lastly, the killing in furtherance of that decision or premeditation" (emphasis supplied).

The instructions track all of the essential points on deliberate premeditation and first prong malice. See *Commonwealth* v. *Chipman*, 418 Mass. 262, 269 (1994), and cases cited. See also *Commonwealth* v. *Gibson, supra* at 246-247 (faulty instruction on third prong inferred malice had no impact on verdict of premeditated murder in the first degree where instructions on deliberate premeditation were correct). We wrote in *Com-*

*monwealth* v. *Gibson* that "deliberate premeditation requires *either* a specific intent to kill that equates with express malice . . . *or* . . . an intent to kill, combined with planning how to effectuate that desire and an evaluation of the 'pros and cons' of proceeding" (emphasis supplied). *Id.* at 247. The judge's instructions conveyed the essence of the concept both of deliberate premeditation and first prong malice according to the alternative language quoted above from *Gibson.* There was no substantial likelihood of a miscarriage of justice.

Inclusion within the context of the deliberate premeditation instruction of a description of all three prongs of malice also did not create a substantial likelihood of a miscarriage of justice, even though the judge should more clearly have instructed the jury that *any* of the three prongs of malice could support a conviction of murder in the second degree but that *only* the first prong could support a conviction of murder in the first degree by reason of deliberate premeditation. See *Commonwealth* v. *Jenks,* 426 Mass. 582, 585 (1998) (inclusion of instructions on second and third prong malice within instruction on deliberate premeditation [even if justified by required instruction on lesser included offense of second degree murder] did not create a substantial likelihood of a miscarriage of justice; instructions on deliberate premeditation were "correct, clear and emphatic," and conviction was sufficiently supported by the evidence); *Commonwealth* v. *Diaz, supra* at 553-554 (unobjected-to instructions on deliberate premeditation that mistakenly included instructions on second and third prong malice created no risk that jury convicted defendant on anything other than deliberate premeditation).

It is highly doubtful that the jury could have concluded that the defendant's killing of Falcon was anything other than intentional and premeditated. Cf. *Commonwealth* v. *Diaz, supra.* The premeditated, intentional nature of the defendant's act is reflected in the following evidence: (1) he stated that he would "take care of it" before going to the parking lot; (2) he covered his head with a hooded sweatshirt; (3) he went to the scene armed with a gun; (4) the victim was killed by a single gunshot wound to the back of his head; (5) the bullet's shell casing was found within two feet of the victim's body, suggesting that the defendant fired the gun close to the victim. Cf. *Commonwealth* v. *Jenks, supra* at 585 (evidence that defendant sought out and took aim at a specific individual supported conviction of murder

in the first degree). The judge's instructions contain no error that warrants reversal of the conviction or a new trial.

2. *Admission of witness's prior written statement.* Daniel Rodriguez testified as a key prosecution witness and described in detail the events in the Alvarez apartment on the night of the shootings. Defense counsel cross-examined Rodriguez, pointing out that certain critical facts to which Rodriguez had testified on direct examination were not included in a signed, written statement concerning the criminal episode that Rodriguez had given to the Springfield police on May 9, 1995, some two months after the shootings. In so cross-examining Rodriguez, defense counsel hoped to demonstrate that the version of events offered in Rodriguez's direct testimony, which in some particulars was more inculpatory than his original written statement, had been recently contrived and was the result of bias against the defendant.

On redirect, the prosecutor attempted to rehabilitate Rodriguez by offering as a prior consistent statement the entire May 9, 1995, written statement. The defendant objected, claiming that the statement went beyond the scope of permissible rehabilitation and improperly focused the jury's attention on the pretrial statement rather than on Rodriguez's trial testimony. The judge overruled the objection and allowed the statement to be admitted in its entirety. He then gave a limiting instruction that the evidence could be used "for the sole purpose of corroborating or rehabilitating the witness." The judge emphasized that the evidence was "not admissible as to the substantive proof of the matters that are in it."

Rodriguez's written statement includes the following account of a conversation Rodriguez claimed to have had with Mack Brown, the defendant's alleged accomplice in the shootings:

> "Mack Brown told me [Rodriguez] that he and [the defendant] did the shooting but that [the defendant] was the one that killed the [victim]. [Brown] said that [the defendant] had shot the [victim] in the head."

The defendant claims that introduction of the entire written statement exceeded the proper scope of rehabilitation and unduly emphasized Rodriguez's pretrial, out-of-court statements. This objection was properly raised at trial. The defendant further claims that admission of hearsay statements attributed to Mack

Brown violated his constitutional right to confrontation under the Sixth and Fourteenth Amendments to the United States Constitution,[3] and, hence, requires reversal and a new trial because those statements were so powerfully and unfairly prejudicial. However, the defendant did not raise a hearsay objection to those statements, and therefore, the confrontation issue was not properly preserved. See *Commonwealth* v. *Rivera*, 425 Mass. 633, 636-637 (1997) (defendant may not object below on one basis and then, on appeal, object on a different basis). Having failed properly to object, the hearsay statements could have been admitted for their full probative value, even though, in this instance, they were not. *Commonwealth* v. *Raymond*, 424 Mass. 382, 388 (1997). We examine whether admitting Brown's hearsay statements created a substantial likelihood of a miscarriage of justice. We conclude that it did not.

Only those portions of Rodriguez's written statement that were *consistent* with his trial testimony were properly admissible to rehabilitate him. Cf. *Commonwealth* v. *Martinez*, 425 Mass. 382, 396 (1997) (prior consistent statement of witness admissible only to show that witness's in court testimony was not product of asserted inducement); *Commonwealth* v. *Sullivan*, 410 Mass. 521, 527 (1991), citing *Commonwealth* v. *Zukoski*, 370 Mass. 23, 26-27 (1976) (same). Error in admitting the entire statement did not, however, "weaken[] [the defendant's] case in some significant way so as to require a new trial." *Commonwealth* v. *Qualls*, 425 Mass. 163, 170 (1997), quoting *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983). The trial record leaves little doubt that the inconsistencies were not focused upon in any way or that the jury were influenced in any meaningful way by them.

Nor did Mack Brown's incriminating hearsay remarks receive significant attention during the trial. The jury were instructed simply that Rodriguez's entire written statement was not to be used by them as substantive evidence of guilt — instructions the jury are presumed to have followed. See *Commonwealth* v. *Pope*, 406 Mass. 581, 588 (1990); *Commonwealth* v. *Helfant*, 398 Mass. 214, 228 (1986); *Commonwealth* v. *Cameron*, 385 Mass. 660, 668 (1982). The jury were not told in the instructions that the written statement also contained inadmissible hearsay statements by Mack Brown. The prosecutor did not

---

[3]The defendant does not make any State constitutional claim.

once mention the hearsay statements during closing argument or use them substantively during trial. See *Commonwealth* v. *Rivera, supra* at 642 (in evaluating whether improperly admitted evidence concerning defendant's right to remain silent created substantial likelihood of a miscarriage of justice, we attached "great weight" to the fact that "the jury's attention was not in any way focused on [that evidence]"). Finally, the evidence against the defendant, including his own statements, admissions, and testimony, was overwhelming. That evidence included motive: the defendant wanted to become a Solids member and knew that carrying out "a mission" might assure that. There also was abundant evidence of planning, premeditation, and deliberation by the defendant: he stated he would "take care of it"; he intended "to do the mission"; and he went to the KFC parking lot armed with a loaded handgun for the purpose of carrying out the enforcer's command that he shoot the suspected rival gang members. The defendant's own statement, which the jury reasonably could have credited, that he had fired his weapon — coupled with the ballistics evidence — established that the defendant shot Falcon in the back of the head with a .22 caliber semiautomatic weapon. As in *Commonwealth* v. *Raymond, supra* at 389, the statement by Brown "contained no new information damaging to [the defendant]," that the Commonwealth's evidence did not independently establish. There was no substantial likelihood of a miscarriage of justice in admitting Daniel Rodriguez's written statement.

3. *Relief under G. L. c. 278, § 33E.* We have reviewed the entire record and conclude that there is no reason to exercise our power under G. L. c. 278, § 33E, either to order a new trial or reduce the verdict. The defendant carried out "a mission" as he had intended. One person was killed. Three others were wounded. For this, he received "full props" from his fellow gang members and life without parole from the Commonwealth.

*Judgments affirmed.*