## COMMONWEALTH vs. LUIS BERRIOS.

Hampden. October 6, 2006. - November 20, 2006.

Present: MARSHALL, C.J., GREANEY, COWIN, SOSMAN, & CORDY, JJ.

*Homicide. Practice, Criminal,* New trial, Plea, Assistance of counsel. *Evidence,* Guilty plea.

A Superior Court judge, in allowing a criminal defendant's motion to withdraw guilty pleas and for a new trial, abused his discretion in concluding that justice may not have been done because of the existence of "a unique situation" that rendered the defendant's pleas involuntary, where the judge's conclusion that the defendant felt that he had no choice but to plead guilty (due to pressure from his mother, girl friend, and former counsel) did not provide a proper basis to invalidate the pleas; where the judge's findings did not support his conclusion that the defendant had demonstrated a viable defense; and where any alleged problems impeding the Commonwealth's ability to sustain its burden of proof at trial had no bearing on the voluntariness of the defendant's guilty pleas. [708-710]

A Superior Court judge acted within his discretion, with adequate record support, in rejecting a criminal defendant's claim that his guilty pleas had not been intelligently made due to ineffective assistance of counsel, where the defendant failed to demonstrate that counsel had conducted an inadequate investigation [711-712]; where the defendant did not meet his burden of showing that counsel had failed to litigate a motion to suppress that had a reasonable likelihood of success [712-714]; and where the defendant fell short in his obligation to present demonstrative proof detailing both the existence and precise character of a conflict of interest [714].

The Commonwealth's failure to disclose certain evidence prior to, and subsequent to, a criminal defendant's entry of guilty pleas did not entitle the defendant to a new trial, where the evidence was not exculpatory, and where the defendant did not meet his burden of demonstrating that the evidence would have accomplished something material for the defense. [714-716]

INDICTMENTS found and returned in the Superior Court Department on May 16, 1995.

A motion to withdraw pleas of guilty was heard by *Judd J. Carhart,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

*Joseph F. Krowski (Jason Howard* with him) for the defendant.

GREANEY, J. We granted the Commonwealth's application for further appellate review to determine whether the defendant, who entered a guilty plea to being an accessory before the fact to murder in the second degree (among other charges), was properly granted a new trial. The charges were based on the defendant's involvement in a gang-related shooting that occurred in Springfield on February 28, 1995, in which one person was killed and three others wounded. The Superior Court judge, who accepted the defendant's guilty pleas, allowed the defendant's motion to withdraw the pleas and for a new trial on the ground that the pleas were not voluntary. The Appeals Court affirmed on a different ground, concluding that the defendant's pleas were not intelligently made due to the ineffective assistance of his plea counsel. *Commonwealth* v. *Berrios,* 64 Mass. App. Ct. 541, 556-557 (2005). We vacate the order allowing the defendant's motion to withdraw his pleas and for a new trial. The original convictions are to be reinstated.

1. We set forth the background and procedural history of the case.

a. This is the third appeal arising from the February 28, 1995, shooting. See *Commonwealth* v. *Francis,* 432 Mass. 353 (2000); *Commonwealth* v. *Jiles,* 428 Mass. 66 (1998). The facts underlying the shooting are stated in the *Francis* and *Jiles* decisions, and are described in the *Francis* case as follows:

> "On the evening of February 28, 1995, Carlos Falcon and three other men were shot after leaving a Kentucky Fried Chicken (KFC) restaurant on State Street in Springfield. Falcon died as a result of being shot once in the back of the head. The other three men survived.
>
> "Earlier that evening, members of two Springfield gangs known as Los Solidos and the Original Family Organization (OFO), a subordinate group whose members aspired to membership in Los Solidos, gathered in the apartment of Sharleen Alvarez located on the fourth floor

at 659 State Street. Los Solidos members present were [Robert Francis], [the defendant], Victor Figueroa, Johnny Sanchez, Luis Concepcion, and David Jiles. OFO members present were Daniel Rodriguez ('president' of OFO and the Commonwealth's cooperating witness in [the trial of Francis]), Michael Borden [also known as Mack Brown], Jason Jiles,[1] and Sharleen Alvarez.

"The Commonwealth presented evidence that warranted a finding that [Francis] was the 'chief enforcer' of Los Solidos, responsible for taking care of the gang's guns, handling threats to the gang, and, during 'wartime,' exercising control over the gang in cooperation with its 'warlord.' There was testimony that, on the date of the shootings, Los Solidos were in a state of 'war' with a rival gang, the Latin Kings.

"Rodriguez testified that, at some point that evening, Concepcion and David Jiles entered the apartment and told the group that members of the Latin Kings were at the KFC 'throwing signs,' which meant that they were disrespecting Los Solidos by displaying their hand signal. When some of those present urged retaliation, [Francis] took charge, stating, 'Everybody just calm down. We going [sic] take care of this.' He summoned Rodriguez, Borden, Jason Jiles, and [the defendant] into the bathroom, where he said, 'If you can get those Kings, we got to do what we got to do.' Jason Jiles responded that he would take care of it. [Francis] then directed Rodriguez and [the defendant] to leave while [Francis] remained in the bathroom with Borden and Jiles.

"Returning from the bathroom, [Francis] told Rodriguez, 'Don't worry about it. I'm gon' [sic] take care of it. Let me do my job.' Jason Jiles, in [Francis's] presence, picked up a .22 caliber semiautomatic handgun and said, 'I'm going to do this.' [Francis] then instructed Jason Jiles to '[g]et a hoody,' referring to a hooded sweatshirt, which Jiles put on before leaving the apartment. Borden also left the apartment at this time, and when Rodriguez asked

[1]We shall refer to David Jiles and Jason Jiles, whom the defendant believed to be cousins, by their full names to avoid any confusion.

where [Borden] had gone, [Francis] told [Rodriguez] not to worry about it. Borden often carried a .38 caliber revolver. Rodriguez testified that, shortly thereafter, Jason Jiles returned to the apartment and said, 'Those ain't Kings,' to which [Francis] responded, 'They Kings. They Kings. Go do what you got to do and take care of it.' Jason Jiles again left the apartment.

"There was testimony by the Commonwealth's witnesses about the events outside the apartment. Just prior to the shooting, Carlos Falcon and three companions had left the KFC. The three men were seated inside Falcon's automobile, and Falcon was standing at the rear of the vehicle. A man matching the description of Borden approached and, after a brief verbal exchange, shot the three men in the vehicle with a .38 caliber revolver, wounding them. Jason Jiles, approaching from the rear, shot Falcon once in the back of the head with a .22 caliber handgun, killing him.

"Jason Jiles and Borden then returned to the State Street apartment, where they were congratulated by the others." (Footnote omitted.)

*Commonwealth* v. *Francis, supra* at 354-356.

Francis was convicted by a jury as an accessory before the fact of murder in the first degree by reason of deliberate premeditation; as an accessory before the fact on three indictments charging armed assault with intent to murder; and of assault and battery by means of a dangerous weapon, and his convictions were affirmed. *Id.* at 354. Jason Jiles was tried separately, and we affirmed his conviction of deliberately premeditated murder in the first degree for the shooting death of Falcon. *Commonwealth* v. *Jiles, supra* at 66-67. Jason Jiles also was found guilty on three indictments charging armed assault with intent to murder, and of assault and battery by means of a dangerous weapon, for the shootings of Falcon's three companions. *Id.* Borden was taken into custody after Francis's convictions and entered guilty pleas to charges of murder in the second degree and conspiracy to commit murder, and to three charges of assault and battery by means of a dangerous weapon. *Commonwealth* v. *Francis, supra* at 356 n.2.

b. On May 12, 1995, in connection with the shooting, a grand jury returned an indictment charging the defendant with conspiracy to commit murder. The defendant was arrested on this charge and signed a written statement dated May 15, 1995, in which he admitted to having ordered the shooting (confession). On May 16, 1995, the grand jury returned indictments charging the defendant with being an accessory before the fact to murder in the first degree; being an accessory before the fact to armed assault with intent to murder (three indictments); and being an accessory before the fact to assault and battery by means of a dangerous weapon (three indictments). In January, 1996, on the day scheduled for trial, the defendant, who was represented by counsel (whom we shall refer to as former counsel), entered a guilty plea to being an accessory before the fact to murder in the second degree, thereby permitting him to be sentenced to life imprisonment with the possibility of parole in fifteen years.[2] The sentence reflected the judge's acceptance of the parties' agreed-on recommendation.

During the defendant's plea colloquy, the substance and facial adequacy of which is not challenged, the prosecutor recited the facts he would prove at trial. Among these was the fact that it was the defendant, who was in a "position[] of authority" as a former president of Los Solidos, together with Francis, who called the meeting in the bathroom where orders were given to other gang members and prospective gang members to confront the Latin Kings across the street. There, the defendant made several statements, including statements that "everything is ready to go," and telling Jason Jiles to "go and do them." After Jason Jiles and Borden left the apartment and went to the Kentucky Fried Chicken restaurant, the defendant want to a window in the apartment and remarked, "It's going to happen now," and instructed the others to sit down. When Jason Jiles

[2]The Commonwealth entered a nolle prosequi on the conspiracy to commit murder charge. On the remaining indictments relating to the shooting, the defendant entered guilty pleas and was sentenced on each conviction to a prison term of from three to five years, to be served concurrently with his sentence on the accessory before the fact to murder in the second degree conviction. The defendant also entered guilty pleas to, and was sentenced on, two firearms charges that occurred on June 1, 1994, and that were unrelated to the February 28, 1995, shooting.

returned, the defendant congratulated him. The defendant agreed with the prosecutor's statement of facts, and admitted that he had "counsel[led] [Jason Jiles and Borden] to go shoot and kill the people in that car."

c. In 1997, the defendant, pro se, filed a motion to withdraw his guilty pleas and for a new trial. Subsequently, in August, 2001, the defendant, represented by new counsel (current counsel), filed a similar motion. The defendant argues in these motions, insofar as relevant to this appeal, that his guilty pleas were involuntary because they were the product of coercion and "the result of ineffective assistance of [his former] counsel." The ineffective assistance of counsel claim is predicated on allegations of his former counsel's failure to investigate, failure to press a viable motion to suppress the defendant's confession as involuntary based on police brutality and misconduct, and conflict of interest. In addition, the defendant argues that he should be permitted to withdraw his guilty pleas because the prosecution withheld exculpatory evidence, namely, the handwritten notes of the assistant district attorney taken during a pretrial interview with a codefendant, Luis Concepcion.

The judge who had accepted the defendant's guilty pleas held an evidentiary hearing on the motions. The defendant testified, as did his former counsel, his mother, his girl friend, and the lawyer who represented Concepcion in January, 1996. Through cross-examination of the defendant, the Commonwealth introduced documentary evidence, but called no witnesses.

In a written decision, the judge made findings of fact that we set forth in the Appendix to this opinion. After making the findings, the judge rejected the defendant's assertion that he had been denied effective assistance of counsel, explaining:

> "Although, in hindsight, it can be argued that [the defendant's former counsel] should have sought to interview Rodriguez and Concepcion, and that he should have followed up leads provided to him by the defendant, his preparation for trial was thorough. Given the reality of the Commonwealth's case against the defendant, coupled with the finality of a lifelong sentence without parole should the defendant be convicted of first degree murder, it was not unreasonable for [former counsel] to advise the

defendant that he should accept the proposed plea bargain which allowed him to plead guilty to second degree murder."

The judge went on to state, however, that because of the existence of what he characterized as "a unique situation," the defendant's pleas had been involuntarily made, thus necessitating relief from the pleas. The judge indicated that the defendant "was a credible witness in his assertion that he did not want to plead guilty," and that his state of mind was one of resignation because he believed that he had no choice but to plead guilty. Also factoring in the judge's observation about "a unique situation" was his assessment that the principal witnesses for the Commonwealth might have "some credibility problems." The judge concluded that the defendant had "demonstrated that he had a viable defense to all charges relating to the murder and shootings." The judge explained that "the defendant's testimony at the hearing described a different set of events which, if believed, would exonerate him from involvement in the planning of the murder." The judge noted with respect to the defendant's confession that he did not have to determine whether the police acted as alleged by the defendant because, the judge reasoned, "[t]he important factor as it weighs upon the defendant's state of mind at the plea hearing is that the defendant had told [his former counsel] of the allegation of police conduct, which, if true, would render the confession inadmissible." Both parties appealed.

d. The Appeals Court upheld the grant of a new trial for the defendant, but did so on a different ground, concluding, as mentioned, that the defendant's pleas were not intelligently made due to the ineffective assistance of his former counsel. *Commonwealth* v. *Berrios*, 64 Mass. App. Ct. 541, 543 (2005). The Appeals Court explained that the defendant's former counsel's conduct was manifestly unreasonable because he failed to investigate and, thus, learn that Rodriguez had testified differently at Jason Jiles' trial than at the grand jury proceedings in connection with the shootings. *Id.* at 550. The consequence of counsel's shortcoming "was that the defendant's decision to plead guilty was not made intelligently in that he had a false view of the strength of the evidence against him." *Id.* at 551.

The Appeals Court also observed that former counsel's failure to litigate a motion to suppress the defendant's confession dated May 15, 1995, constituted "a further factor contributing to the conclusion that the defendant received ineffective assistance of counsel in deciding whether to plead guilty." *Id.* at 552.

2. "A postsentence motion to withdraw a plea is treated as a motion for a new trial." *Commonwealth* v. *Conaghan*, 433 Mass. 105, 106 (2000). Although the disposition of such a motion is within the discretion of the judge, a rigorous standard must be applied and a judge may only allow such a motion "if it appears that justice may not have been done." *Commonwealth* v. *DeMarco*, 387 Mass. 481, 482 (1982), quoting Mass. R. Crim. P. 30 (b), 378 Mass. 900 (1979). A "plea is valid only when the defendant offers it voluntarily, with sufficient awareness of the relevant circumstances, *Brady* v. *United States*, 397 U.S. 742, 748-749 (1970), and with the advice of competent counsel. *Id.* at 758." *Commonwealth* v. *Fernandes*, 390 Mass. 714, 715-716 (1984). See *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). "[A] guilty plea is void if it is involuntary and unintelligent for any reason." *Huot* v. *Commonwealth*, 363 Mass. 91, 96 (1973).

3. *Voluntariness of the pleas.* The judge abused his discretion in concluding that justice may not have been done because of the existence of "a unique situation" that rendered the defendant's pleas involuntary. A plea is voluntary if entered without coercion, duress, or improper inducements. *Commonwealth* v. *Duest*, 30 Mass. App. Ct. 623, 631 (1991), citing *Brady* v. *United States*, *supra* at 750, 755. The judge correctly recognized that the stress inherent in entering guilty pleas, such as the concern of possibly receiving a harsher sentence if a defendant is tried and found guilty, and pressure from family members and from counsel, do not necessarily render pleas involuntary, and these considerations did not make the defendant's pleas involuntary. See *Commonwealth* v. *Quinones*, 414 Mass. 423, 436 (1993); *Commonwealth* v. *Morrow*, 363 Mass. 601, 606-607 (1973); *Huot* v. *Commonwealth*, *supra* at 95-99.

Contrary to what is stated in the Appeals Court's opinion, see *Commonwealth* v. *Berrios*, *supra* at 555, the judge did not

expressly credit the defendant's testimony that his will in fact was overcome because of pressure from his mother, girl friend, and former counsel. The judge merely noted that the defendant had *testified* to that effect. The judge's conclusion that the defendant felt that he had no choice but to plead guilty does not provide a proper basis to invalidate the pleas. See *Commonwealth* v. *Quinones, supra; Commonwealth* v. *Morrow, supra; Huot* v. *Commonwealth, supra.* These considerations are attendant to the defendant's recognition of the gravity of the charges against him and the possible sentences he faced, and they are "endemic to any system which asks a person to forgo certain rights in order to be spared certain penalties." *Commonwealth* v. *Bowen,* 63 Mass. App. Ct. 579, 584 (2005), quoting *Commonwealth* v. *Damiano,* 14 Mass. App. Ct. 615, 619 (1982).

In addition, the judge's findings do not support his conclusion, referencing the "unique situation," that the defendant had demonstrated a "viable defense." The judge did not specifically explain the reasons for determining the situation was "unique." The judge noted that, "if believed," the defendant's testimony at the evidentiary hearing would "exonerate" him. The judge, however, did not actually credit the entirety of the defendant's testimony. The judge also did not credit any portion of the defendant's testimony that would support a finding of exoneration. See *Commonwealth* v. *Hubbard,* 371 Mass. 160, 168-169 (1976).

Similarly, with respect to the defendant's confession dated May 15, 1995, the judge never credited or discredited the defendant's allegations of police brutality or misconduct, and never found that a motion to suppress that confession would have, or should have, been allowed. See *Commonwealth* v. *Comita,* 441 Mass. 86, 93 (2004); *Commonwealth* v. *Hubbard, supra.* The significance of the judge's determination, that the defendant had reported allegations of police misconduct to his former counsel, is based on the assumption that the confession would be inadmissible only if such misconduct were true.[3] Even if the defendant's confession had been suppressed (an unlikely

---

[3]The defendant's reliance on *Commonwealth* v. *Chetwynde,* 31 Mass. App. Ct. 8 (1991), is misplaced. That case is distinguishable for a number of

ruling), the Commonwealth's evidence against the defendant remained strong, as Rodriguez, David Jiles, and Concepcion had implicated the defendant in the planning of the shootings.

Finally, it is hardly unusual, in a gang-related shooting, that the Commonwealth might have "credibility problems" with some of its witnesses, including the witnesses named above. Such "problems" typically do not impede the Commonwealth's ability to sustain its burden of proof at trial, see *Commonwealth v. Latimore*, 378 Mass. 671, 677-678 (1979), but, rather, relate to the weight of the evidence and are properly left to the fact finder for resolution. More important, the judge failed to demonstrate how this potential problem for the Commonwealth has any bearing on the voluntariness of the defendant's pleas. In view of testimony of Rodriguez at the trial of Jason Jiles, that Borden had purchased drugs from the defendant, it is likely that the defendant, who had testified at the evidentiary hearing on his motion to withdraw his guilty pleas that the gang was an organization committed to doing only good ("they were everything but negative, everything they did was positive") and serving the community, also would have faced serious character and credibility issues of his own had he proceeded with trial and chose to testify. His testimony about the social beneficence of Los Solidos lacks any credibility in view of the gang's criminal activities and the defendant's position of authority in the gang as it engaged in its illegal and violent enterprises.

reasons, including the fact that the defendant's confession in that case was the crux of the Commonwealth's case, and the defendant had alleged that his counsel had misrepresented that his motion to suppress a recorded confession had been denied. *Id.* at 11, 14. Here, the defendant's confession was not the centerpiece of the Commonwealth's case. The Commonwealth's additional evidence against the defendant, namely Rodriguez's written statement and grand jury testimony, David Jiles's written statement, and Luis Concepcion's written statement, was strong and implicated the defendant in the planning of the shootings. While the defendant presented evidence attempting to analogize his situation to that in the *Chetwynde* case, the judge did not make specific findings crediting the defendant's version of events, and there was evidence to the contrary (for example, the defendant's former counsel's notes indicating that, on the day before the defendant entered his guilty pleas, counsel pointed out and discussed the fact that, by pleading guilty, the defendant would be waiving a viable motion to suppress, and that the defendant understood this consequence). Indeed, the defendant cites only to the transcript of the evidentiary hearing to support his argument. His claims lack merit. See *Commonwealth v. Hubbard*, 371 Mass. 160, 168-169 (1976).

4. *Ineffective assistance of counsel.* "It is beyond dispute that a defendant's decision whether to plead guilty or proceed to a trial is a critical stage in a criminal proceeding for which he is constitutionally entitled to the effective assistance of counsel." *Commonwealth* v. *Mahar,* 442 Mass. 11, 14 (2004), and cases cited. The judge acted within his discretion, with adequate record support, to reject the defendant's claim of ineffective assistance of counsel on the claim that the guilty pleas had not been intelligently made. We also conclude that the Appeals Court erroneously concluded that the defendant's pleas were not intelligently made because he had been deprived of effective assistance of his former counsel in the respects next discussed. See *Commonwealth* v. *Berrios, supra* at 547-553.

a. *Failure to conduct adequate investigation.* The defendant's claim that his former counsel was ineffective because he failed to conduct an adequate investigation is predicated on evidence proffered at the evidentiary hearing instead of findings of fact and conclusions of law made by the judge. It is implicit that the judge discredited the defendant's version of events tendered at the hearing; consequently, the defendant's claims lack merit.[4] See *Commonwealth* v. *Hubbard, supra.* Without detailing the numerous specifics, we add that the defendant's evidence at the hearing was contradicted and would not require a conclusion in his favor. It was inappropriate on the current record for the Appeals Court to uphold the judge's ultimate decision (allowing the motion to withdraw the defendant's guilty pleas) on the ground of an inadequate investigation by the defendant's former counsel. See *Commonwealth* v. *Berrios, supra* at 547-551. Further, with respect to many of the deficiencies alleged by the defendant as support for his ineffective assistance of counsel claim (for example, the failure of former counsel to inspect

---

[4]We agree with the Commonwealth that the defendant unfairly accounts for the imperfect memory of his former counsel and unfairly portrays him as deficient in preparation and investigation. The defendant's former attorney was told that he had been summonsed to testify at the evidentiary hearing on the defendant's motion to withdraw his guilty pleas (conducted in the summer of 2002) so that he could authenticate letters. Although he attempted to review the defendant's file, the file, maintained by his former law firm, was not complete. Not surprisingly, when he testified at the evidentiary hearing, the defendant's former counsel did not have a clear memory of events that had transpired, and his thoughts, in 1995 and January, 1996.

the bathroom where the shooting was planned), the defendant failed to satisfy his burden of demonstrating that the absence of those alleged deficiencies (and any others) would have accomplished something material for the defense. See *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 (1977).

The Appeals Court specifically relied on former counsel's failure to investigate (review) the testimony of Rodriguez given at the trial of Jason Jiles in late 1995, several weeks before the defendant entered his pleas. *Commonwealth* v. *Berrios, supra* at 547. The Appeals Court's ultimate conclusion (of ineffective assistance) rested on its view that former counsel was not aware that Rodriguez had significantly "changed his testimony" from that before the grand jury. *Id.* Specifically, the Appeals Court pointed to the failure of Rodriguez, at Jason Jiles's trial, to identify the defendant as a person in the bathroom when the shootings were ordered. *Id.* at 547 & n.15.

The Appeals Court overstated the possible import of Rodriguez's testimony at Jason Jiles's trial. At that trial Rodriguez may not have inculpated the defendant such as he previously had done in a written statement to police and in his grand jury testimony, where he identified the defendant as having been in the bathroom when the shootings were ordered. Rodriguez, however, did not retreat from his prior statement and testimony incriminating the defendant, and he was not challenged on any discrepancies. In view of the facts that: (a) the Commonwealth was then prosecuting Jason Jiles (and not the defendant); (b) Rodriguez's testimony at Jason Jiles's trial was not *exculpatory* of the defendant; and (c) Rodriguez could not convincingly give testimony exculpating the defendant because of Rodriguez's statement to the police and his grand jury testimony that convincingly incriminated the defendant, the Appeals Court erroneously concluded that there was "a serious question of effective assistance" on the possible impact of Rodriguez's testimony. *Commonwealth* v. *Berrios, supra* at 550.

b. *Failure to litigate the motion to suppress.* What we have said, in assessing whether the defendant's pleas were voluntary, applies equally to former counsel's failure to pursue the motion to suppress the defendant's confession. The judge never credited or discredited the defendant's allegations of police brutality or

misconduct that constituted the core of the motion,[5] thus implicitly rejecting the accusations. See *Commonwealth* v. *Hubbard, supra.* The judge never found that a motion to suppress the confession would have, or should have, been allowed. See *Commonwealth* v. *Comita,* 441 Mass. 86, 93 (2004). The defendant's confession was not the centerpiece of the Commonwealth's case, and his (and the Appeals Court's) reliance on *Commonwealth* v. *Chetwynde,* 31 Mass. App. Ct. 8 (1991), is misplaced, as has been discussed. See note 3, *supra.* See also *Commonwealth* v. *Berrios, supra* at 552. To require the litigation of a suppression motion in every case prior to the entry of guilty pleas would frustrate judicial economy.

The defendant argues that "many factors demonstrate that the motion [to suppress his confession] had a reasonable likelihood of success." The record, however, does not support this assertion. As has been stated, the judge never credited the defendant's claims of police brutality or misconduct. The defendant's mother and girl friend only testified that when they saw the defendant on Sunday, May 14, 1995, he was crying and his face was swollen. This testimony does not compel a conclusion that the defendant had been physically abused by the police.

More important, the photographs submitted by the defendant at the evidentiary hearing do not corroborate his claim that the police beat him while he was in custody from May 12 to May 14, 1995. As recognized by his former counsel, the photographs were highly suspect because they appear to have been taken in a residential setting after the relevant time. The value of the defendant's testimony, that he was in fear when he confessed because the police previously had beaten him on September 27, 1994, was undermined by documentary evidence. The defendant submitted hospital records to try to corroborate this previous beating. The records were dated just before midnight on September 27, and reflect that the defendant claimed that the police had beat him within the past fourteen hours (at 10 A.M. on September 27). This submission, however, was seriously

[5]The Appeals Court incorrectly states that the judge "found that the defendant was a credible witness." *Commonwealth* v. *Berrios, supra* at 552. Rather, the judge only made a limited finding that the defendant was credible *in his generalized assertion that he did not want to plead guilty.*

undermined by a booking sheet that indicated that the defendant had been arrested just before noon on September 26, 1994, and a booking photograph of the defendant that does not depict any injuries.

Further, the defendant's effort to show that one of the police officers involved in his alleged beating had a history of misconduct lacked substance because similar allegations, advanced by others (and offered by the defendant at his hearing), had been rejected by the judges who heard their motions to suppress. There was no credible evidence of a pattern of misconduct on the part of the police.

Finally, the defendant's own testimony concerning misconduct was inconsistent. For instance, the defendant claimed not to have been advised of his Miranda rights, the right to use the telephone, or the right to a prompt arraignment, but he had signed and initialed a form (witnessed by another) indicating that he had been notified of all his rights. In addition, the defendant claimed that the police record of telephone contact was false, but he admitted that the record of a visit was accurate. In the final analysis, the defendant failed to meet his burden on the likelihood of success on the motion.

c. *Alleged conflict of interest.* There are no findings and conclusions whether the defendant's former counsel's representation was hampered in any material way by a conflict of interest because of counsel's seeking a seat on the Springfield school committee while he was representing the defendant. We conclude that the judge implicitly rejected this claim. See *Commonwealth* v. *Hubbard, supra.* The evidence introduced at the evidentiary hearing on the issue did not require findings in the defendant's favor on the issue. The record demonstrates that the defendant fell short in his obligation "to present demonstrative proof detailing both the existence and the precise character of [the] alleged conflict of interest." *Commonwealth* v. *Miller,* 435 Mass. 274, 282 (2001), quoting *Commonwealth* v. *Shraiar,* 397 Mass. 16, 20 (1986).

5. We reject the defendant's contention that he is entitled to a new trial because the Commonwealth failed to disclose alleged exculpatory evidence prior to, and subsequent to, the time he entered his guilty pleas. Specifically, the defendant asserts that

handwritten notes taken by the assistant district attorney of a pretrial interview with Concepcion (with Concepcion's attorney present) contain exculpatory evidence.

The defendant's claim is framed in terms that seek to circumvent the established rule "that a guilty plea, intelligently and voluntarily made, bars the later assertion of constitutional challenges to the pretrial proceedings." *Lefkowitz* v. *Newsome,* 420 U.S. 283, 288 (1975). "When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Id.,* quoting *Tollett* v. *Henderson,* 411 U.S. 258, 267 (1973). See *Commonwealth* v. *Fanelli,* 412 Mass. 497, 500 (1992).

In any event, we agree with the judge's earlier ruling (predating his order allowing the defendant's motion to withdraw his guilty pleas) that the notes were not exculpatory. There is no dispute that the notes essentially mirrored Concepcion's earlier written statement to police given while under arrest on an unrelated offense. In that written statement, Concepcion indicated that, on the date of the shooting, the defendant held a meeting in the bathroom with Figueroa, Sanchez, and Francis to discuss what to do about the disrespect displayed by the rival gang members across the street. Concepcion went on to state that, after the meeting, the defendant called over Borden and Jason Jiles and gave them "the mission" to kill those gang members.

The defendant suggests that the prosecutor's notes were exculpatory because they would essentially show that Concepcion's written statement was false. To support that conclusion, the defendant points to separate letters written by Concepcion to David Jiles and Jason Jiles after Concepcion had signed his written statement to police. The defendant reads too much into these letters. The letters do not render the aspects in Concepcion's written statement to police regarding the *defendant's* role in the shooting "a self admitted lie."

In his letter to David Jiles, Concepcion states that he Concepcion "snitch[ed]" and implicated "Mack and Johnny" because he "had to" to exonerate others who in fact had been involved.

Significantly, Concepcion never suggests that he falsely implicated the defendant. In his letter to Jason Jiles, Concepcion writes that the defendant "is going all out singing" and is "trying to bring everybody down." Concepcion continues, "[the defendant is] going out like a snitch that's why I went all out on him." This comment is no admission that Concepcion *falsely* implicated the defendant. Rather, it only suggests the motive for implicating the defendant, namely that the defendant had "snitch[ed]," while not naming others involved.

The claim fails also because the defendant did not meet his burden of demonstrating that the notes would have accomplished something material for the defense. See *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977). As has been stated, there is no dispute that the notes essentially mirrored Concepcion's earlier written statement to police given while under arrest on an unrelated offense. As such, the notes were merely cumulative and do not create "a reasonable doubt that did not otherwise exist." *Commonwealth* v. *Castro*, 438 Mass. 160, 168 (2002), quoting *Commonwealth* v. *Gregory*, 401 Mass. 437, 442 (1988).

6. We vacate the order allowing the defendant's motion to withdraw his pleas and for a new trial. The original convictions are to be reinstated.

*So ordered.*

### APPENDIX.

The judge's findings of fact are as follows:

"On February 28, 1995, at approximately 10:30 P.M., Carlos Falcon was shot and killed in the parking lot of the Kentucky Fried Chicken restaurant in Springfield. Three of Falcon's companions were also shot [and] survived. The two men who shot the victims, [Borden] and Jason Jiles . . . , were members of Los Solidos gang. Los Solidos and another gang, the Latin Kings, were in a state of 'war' at the time. Apparently the four victims were members of the Latin Kings gang. . . .

"The Commonwealth's theory in [the prosecutions of Jason Jiles and Borden] was that there had been a meeting of Los Solidos at the apartment of Charlene Alvarez (Alvarez) just prior to the shootings. During the meeting two members of the gang entered the apartment and excitedly told the group that there were Latin Kings across the street and that they were making gang signs in a show of disrespect to Los Solidos. According to the Commonwealth,

a meeting took place in the bathroom of Alvarez's apartment in order to plan a response to the presence of the Latin Kings. Among those allegedly present at the meeting were the defendant, Robert Francis who was the Chief Enforcer of Los Solidos, Luis Concepcion (Concepcion), [Jason] Jiles and Borden. It was at this meeting, according to the Commonwealth, that the defendant and Francis urged [Jason] Jiles and [Borden] to kill the Latin Kings.

"On May 4, 1995 the defendant was arrested by the Springfield police. He was searched and a gun was seized. The defendant was then taken to the police station. At the station, he was interviewed by Lieutenant Kelly (Kelly). The defendant knew Kelly from a previous arrest in 1994. After his arrest in 1994, the defendant filed a complaint against Kelly alleging that Kelly had beaten him. On May 4, 1995, Kelly asked the defendant to cooperate in the Falcon murder investigation. The defendant refused to do so, but made an inculpatory statement relative to the gun which the police had seized. The defendant was subsequently released and the gun and the statement that he had given the police were suppressed by a [District Court judge.[1]]

"On Friday, May 12, 1995, at approximately 5:30 P.M., the defendant was arrested by the Springfield police and charged with conspiracy to murder. He was held over the weekend and on Sunday, May 14, he signed a statement implicating himself in the planning of the murder of Carlos Falcon [the confession dated May 15, 1995]. He was arraigned on May 15, and was appointed counsel. On May 16, he was indicted for the offenses to which he would plead guilty on January 17, 1996. Subsequent to his arraignment, the defendant's family hired [former counsel] to represent him.

"Much, if not all, of the thrust of the defendant's argument centers on what occurred at the Springfield Police Department over the weekend of May 12 to May 14. The defendant presented evidence that he was not allowed to make a telephone call and that he was not fed. He alleged that, on Saturday, May 13, he was twice placed in a room alone with Kelly and that Kelly beat him. He alleged that Kelly told him to sign a statement that Kelly had prepared and that, in exchange for his cooperation he would be sentenced to a term of five to ten years in State Prison. He alleged that he refused to sign the statement and that on Sunday, May 14, he was again placed in a room with Kelly. He alleged that Kelly showed him a pistol and told him that if he contacted an attorney that there would be no deal. He alleged that Kelly again asked him to sign a statement but that he refused. He alleged that later that afternoon he was brought to a private room and again met with Kelly alone. Kelly told him that his family was outside and, indeed, he could hear his mother and girl friend's voices in the hall. He alleged that he was overcome with emotion and fear and that he therefore signed the statement.

"The defendant told [former counsel] his version of what occurred over the weekend of May 12th. He and [former counsel] discussed the viability of the statement being suppressed. He also told [former counsel] that although he had been the President of Los Solidos, he had been suspended since December 1994. He told [former counsel] that the meeting at Alvarez's apartment was an attempt by other gang members to have the defendant rejoin the gang. He showed [former counsel] a letter of suspension that was dated December 14,

---

[1]The gun and the statement were suppressed because the District Court judge found that no probable cause existed to stop or search the defendant.

1994 and signed by Juan DeJesus, Warlord. The reason for the suspension as stated in the letter was that the defendant struck a fellow gang member, Concepcion. The defendant also told [former counsel] that there was a table of organization of Los Solidos and that this document clearly spelled out that, during times of 'war,' the president was not empowered with the right to give orders. Rather, all decisions and orders were made by the Chief Enforcer. [Former counsel] never obtained that document.

"The Commonwealth notified the defendant that Daniel Rodriguez (Rodriguez) would be a witness for the Commonwealth. Rodriguez had previously testified before the Grand Jury and had implicated the defendant in the planning of the murder. [Former counsel] never sought to interview Rodriguez. Just prior to the trial date, the Commonwealth notified the defendant that Concepcion would also be a witness for the Commonwealth. [Former counsel] was in possession of letters that Concepcion had written to Jiles[2] wherein Concepcion opined that the defendant was a cooperating witness and that he (Concepcion) would protect [Jason] Jiles.

"[Former counsel] reviewed all discovery provided to him and had several discussions with the defendant as to the prospect of an acquittal. [Former counsel] discussed strategy with more experienced attorneys and gave the case careful consideration. Given the information with which he had been provided, I find that [former counsel] was prepared to litigate a Motion to Suppress the defendant's statement and, subsequent to the motion hearing, to try the defendant's case.

"Shortly before the case was scheduled for trial, the Commonwealth notified [former counsel] that Concepcion had agreed to testify against the defendant. [Former counsel] met with the defendant after he had been advised that Concepcion was going to be a witness for the Commonwealth. [Former counsel] was in possession of letters that Concepcion had written to Jiles wherein Concepcion opined that the defendant was a cooperating witness and that he (Concepcion) would protect [Jason] Jiles. [Former counsel] told the defendant that Concepcion's testimony was devastating to their defense and that he should strongly consider the Commonwealth's offer to allow him to plead guilty to second degree murder.

"Prior to trial [former counsel] was faced with a case in which his client, the defendant, had signed a written confession implicating himself in the planning of a murder. In addition [former counsel] was aware that Rodriguez, who had implicated the defendant before the Grand Jury[,] had also agreed to testify. Finally, [former counsel] was told that an additional witness, Concepcion, was willing to testify for the Commonwealth. Based upon this posture of the case, I do not find that [former counsel's] advice to consider the offer to plead guilty to second degree murder was unreasonable. Further, his trial preparation did not fall below that which would be expected from an ordinary fallible attorney.

"On the weekend prior to the defendant's plea, he was visited by his mother and girlfriend. They both told him that they had met with [former counsel] and that they were told that he would likely be convicted of first degree murder and that, consequently, he would never see his child again. They both urged him to accept the offer of a plea to second degree murder.

---

[2]The judge did not distinguish the letters in that one was written to David Jiles and another to Jason Jiles. The oversight is of no significance.

"The defendant testified that he did not want to plead guilty but that his will was overcome by the wishes of his mother and girlfriend as well as by his attorney's advice. The defendant alleges that he had no choice but to accept the plea agreement in order to avoid spending the rest of his life in prison.

"Subsequent to the defendant's plea, Rodriguez testified [at Francis's trial]. Rodriguez' testimony can be fairly interpreted as indicating that only Francis, [Jason] Jiles, and [Borden] were present in the bathroom while the murder was being planned.[3]

"On February 3, 1997, Borden pleaded guilty to second degree murder. During the plea colloquy, Borden did not agree that the defendant had participated in a meeting to plan the murder."[4]

.

---

[3]The record does not support this finding. At the trial of Robert Francis, Daniel Rodriguez testified that the defendant did participate in a conversation wherein the group expressed a desire to "get those Kings, we got to do what we got to do." Rodriguez explained that he was in the bathroom with Jason Jiles, Michael Borden, Francis, and the defendant, talking about what to do about "the kids downstairs." Jason Jiles said he was going to take care of it. After that conversation, Francis, the warlord, remained in the bathroom with Jason Jiles and Borden. Then, Jason Jiles came out, got a "hoodie" and his gun, and left the apartment. The defendant and Rodriguez watched Jason Jiles from the window. Francis said, "It's going down." Jason Jiles returned to the apartment and left again. This time the defendant and Francis told the other gang members to sit down while the defendant and Francis went to the window. When Jason Jiles returned after the shooting, the defendant, Francis, Victor Figueroa, and Sanchez congratulated him.

[4]The judge's finding technically is correct. It should be noted, however, that in the recitation of facts in Borden's colloquy that resulted in his guilty pleas, there was no identification of the individuals who planned the shootings in the bathroom. Borden agreed that David Jiles and Jason Jiles initially were supposed to carry out the shooting, but that he (Borden) felt that David Jiles was too young, so he (Borden) agreed to take his place. While Borden admitted that he carried out an order to commit the shooting, he never agreed to facts identifying who gave that order.